493 A.2d 1092

**Emilio LOUD**

v.

**STATE of Maryland.**

**No. 1488, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

June 13, 1985.

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Valerie W. Loftin, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and James Salkin, Asst. State's Atty. for Baltimore City, Baltimore, on the brief), for appellee.

Submitted Before MOYLAN, BLOOM and GETTY, JJ.

GETTY, Judge.

On the morning of June 8, 1984, Julia McFall was making a telephone call from a wall phone outside Michael's Grocery located at Patterson Park and Biddle Street in Baltimore. Ms. McFall's observations shortly thereafter resulted in her becoming a principal witness to a robbery and attempted murder. At the conclusion of a court trial in the Circuit Court for Baltimore City (Bothe, J.), Emilio Loud, the appellant herein, was sentenced to fifty years imprisonment following his convictions of assault with intent to murder, robbery with a dangerous and deadly weapon and use of a handgun in the commission of a crime of violence.

Appellant requests us to hold that:

1. The trial judge erred in denying appellant's motion to suppress Ms. McFall's identification of him as the shooter; and

2. The trial judge erred in refusing to merge the ten year sentence for robbery with the thirty year sentence for assault with intent to murder.

We shall do neither.

### Facts

As Ms. McFall was making her call, she observed two black males approach the driver of a Utz Potato Chip van and demand to see inside the truck. The driver attempted to close the door on the right side of the vehicle and one of the two men drew a pistol and shot the driver in the head.[1]

---

1. The victim, Bobby Nestor, was shot above the right eye. Miraculously, he survived. According to the medical reports, the shell

After the victim fell to the sidewalk, Ms. McFall witnessed the shooter search the victim and remove an undisclosed amount of paper money. Both assailants then fled. The distance between the place where Ms. McFall was standing and where the assault took place was estimated to be five feet. That the witness had full opportunity to observe appellant is demonstrated by the following testimony:

"Okay, he backed up and he looked at me and looked at him [presumably, the victim]. And I turned back around in the phone [booth] and kept tossing and turning. And I kept looking at him and he kept looking at me. He said 'come on man' and they ran up the alley. I didn't see him put the gun away."

Ms. McFall indicated that when she first saw the two men involved in the shooting, Nestor was inside the grocery store. The men reappeared fifteen minutes later as Nestor was getting into the truck on the passenger's side. She described the shooter as being tall, with a gold tooth and wearing jeans and a dark blue or black jacket with stripes on the sleeves and around the bottom.

The day after the shooting the police went to the McFall home and showed her eight mug shots. Ms. McFall selected appellant's photograph, placed it to one side, and then refused to look at the array, stating, "[t]he man isn't in there." At trial, however, she testified that she "picked who I thought it was." Approximately two weeks after viewing the photographs, Ms. McFall attended a police lineup and immediately identified appellant as the shooter. Although all of the men in the lineup were black males wearing coveralls, appellant was the only one who appeared in both the mug shots and the lineup.

During his twenty-four day confinement at Johns Hopkins Hospital, Bobby Nestor reviewed a series of photographs and identified appellant as his assailant. At trial

---

fragments were not removed due to the danger involved in such surgery. Nestor is apparently now blind in his right eye.

five months later, however, Nestor was unable to make an in-court identification.

## The Law

The analysis undertaken to determine the admissibility of an extrajudicial identification is well-established. The defense has the initial burden of showing some unnecessary suggestiveness in the procedures employed by the police. If and when a *prima facie* taint is evident, the State must prove by clear and convincing evidence the existence of reliability in the identification that outweighs the corrupting effect of the suggestive procedure. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Godwin v. State*, 38 Md.App. 716, 382 A.2d 596 (1977), *rev'd on other grounds*, 284 Md. 85, 403 A.2d 785 (1978); *Smith v. State*, 6 Md.App. 59, 250 A.2d 285 (1969), *cert. denied*, 397 U.S. 1057, 90 S.Ct. 1402, 25 L.Ed.2d 674 (1970).

The reliability factors to be considered include:
"[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188 [93 S.Ct. 375, 34 L.Ed.2d 401] (1972).

In support of his claim of suggestiveness, appellant cites *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), and *Adams v. State*, 43 Md.App. 528, 406 A.2d 637 (1979), *aff'd*, 289 Md. 221, 424 A.2d 221 (1981). We shall review both cases. The witness in *Foster, supra,* made a tentative identification of the defendant at a lineup and then asked to speak with the defendant. The witness was still uncertain and a second lineup was held ten days later. Foster was the only person to appear in both lineups and on the third try the witness made a positive identification. The Supreme Court held the procedure to be unduly

suggestive characterizing the police as repeatedly saying *"this* is the man." (Emphasis in original.)

*Adams, supra,* is inapposite. The issue decided by the Court of Appeals therein was whether the use of an extension phone, in a voice identification procedure, violated the Maryland Wiretapping and Electronic Surveillance Law, Cts. & Jud.Proc. Art., Sec. 10–401 to 10–412. Appellant quotes, out of context, a statement from our opinion in *Adams,* to-wit: "[a] degree of suggestiveness in the fact that the appellant was the only person in the lineup whose photograph was one of the four to six initially selected by the victim as resembling her assailant." Appellant conspicuously omits that we held under the totality of the circumstances that the lineup identification was reliable. Whether inadvertent or intentional, such inaccuracies should be studiously avoided.

We point out that Ms. McFall testified that she identified appellant from photographs shown to her the day after the crime. The record reveals that the lineup identification was made in reliance on her observations at the scene and not based upon the prior perusal of photographs.

THE COURT: Why did you pick him out of the lineup, because you had seen his photograph or because you had seen him?

WITNESS: I had seen him.

STATE: Seen him do what?

WITNESS: Shoot the Utz potato chip man.

■ We have previously rejected claims of suggestiveness of photo identification preceding lineups. *See McCrae v. State,* 3 Md.App. 388, 239 A.2d 607 (1968) and *Adams, supra.* Reliability, not suggestiveness, is the linchpin in making the determination of admissibility and thus avoiding any substantial likelihood of misidentification. *Manson v. Brathwaite, supra.* Here, at 10:00 a.m., the witness was able to observe and hear the comments made by appellant over a period of time that she estimated to be nearly thirty

minutes and, at the critical time, from a distance of five feet.

■ As in any case, some variations arise in recounting traumatic events. Ms. McFall described appellant's mustache as not full but "little streaks." She did not notice facial scars which the court indicated were not prominent and she didn't observe sideburns because she was concentrating on his face. Minor discrepancies, however, go to the weight of the identification, not to its admissibility. *Joyner v. State*, 7 Md.App. 692, 257 A.2d 444 (1969). The time periods involved, one day after the shooting as to the photographs and nineteen days until the lineup, do not give rise to a likelihood of misidentification based upon suggestiveness. *See Webster v. State*, 299 Md. 581, 474 A.2d 1305 (1984) (13 days from crime to lineup a "relatively short period of time").[2]

## *Merger* [3]

■ The established test for determining if the same act or transaction constitutes a violation of two distinct statutory provisions, or only one, is whether each provision requires proof of a fact which the other does not. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). *Accord, Thomas v. State*, 277 Md. 257, 353 A.2d 240 (1976).

■ Appellant says that under *State v. Frye*, 283 Md. 709, 393 A.2d 1372 (1978), his convictions for robbery and assault with intent to murder should merge. He reasons that unless the trier of fact found beyond a reasonable doubt that an assault was accompanied by an intent that

---

**2.** Nestor's pre-trial identification was admitted although he could not identify appellant at trial. *See Barrow v. State*, 59 Md.App. 169 (1984).

**3.** Appellant did not preserve the issue by failing to object to the imposition of separate sentences. Under *Walczak v. State*, 302 Md. 422, 488 A.2d 949 (1985), an illegal sentence is reviewable even though no objection was made in the trial court.

would constitute murder other than felony murder, the underlying felony must merge. In other words, he is saying that had Nestor died the robbery conviction would merge because the firing of a single shot is consistent with felony murder and inconsistent with premeditated murder. The *Frye* principle is applicable, according to appellant, even though death does not result from the shooting.

In *Frye, supra,* the appellant was convicted of first degree murder and armed robbery and received separate sentences. The State had proceeded on theories of premeditated murder and felony murder. If the verdict was based upon felony murder, the underlying felony would merge under *Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977). Under independent proof of willful, deliberate and premeditated murder, merger would not occur under the required evidence test. *Newton, supra.* The Court of Appeals was unable to determine upon which theory of murder the jury rested its verdict and resolved the doubt in the defendant's favor.

Appellant seems to be saying that just because Nestor survived a gunshot between the eyes he, appellant, should not suffer cumulative sentences. We do not believe that the rationale for merger in felony murder cases, articulated in *Newton* and later in *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977), is applicable to the case *sub judice.* If Nestor had died the State could have obtained a murder conviction by proving the underlying felony of armed robbery which would have been an essential element of the felony murder. In the posture of the present case, however, the State was required to go beyond proof of robbery and establish an intent to murder. Thus, as each offense required proof of a fact that the other did not, the convictions did not merge.

We think *Johnson v. State,* 56 Md.App. 205, 467 A.2d 544 (1983), *cert. denied,* 299 Md. 136, 472 A.2d 999 (1984), is controlling. We held in *Johnson* (Adkins, J.) that attempted armed robbery and assault with intent to murder do not

merge under the required evidence test set forth in *Brooks v. State,* 284 Md. 416, 397 A.2d 596 (1979), as each offense required proof of a fact which the other did not; *i.e.,* intent to murder in one situation, intent to rob in the other. The differing elements in the present case are proof of intent to murder and proof of theft.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.