619 A.2d 123

**Michael GRAVES**

v.

**STATE of Maryland.**

**No. 1747, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Jan. 27, 1993.

652

Diane E. Horvath, Assigned Public Defender, Columbia (Stephen E. Harris, Public Defender on the brief, Baltimore), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr. Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City on the brief), Baltimore, for appellee.

Argued before MOYLAN, BISHOP and FISCHER, JJ.

BISHOP, Judge.

For the first time we are confronted with the issue of whether, for conflict of interest purposes, the Public Defenders's Office is to be held to the same standards as a private law firm.

Appellant, Michael Graves (Graves), was charged with assaulting Derek Jones (Derek), assaulting David Jones (David), and attempted robbery with a dangerous and deadly weapon. Graves pleaded not guilty and prayed a jury trial in the Circuit Court for Baltimore City. The jury was sworn on October 15, 1991, and on October 16th the trial

court denied Graves's motion to suppress and motion for mistrial. The jury convicted Graves of both assault charges and acquitted him of attempted robbery. On November 22, 1991, Graves was sentenced to ten years, all suspended, for assaulting Derek; ten years consecutive, all except five years suspended, for assaulting David; and five years probation.

## *Issues*

Graves presents six issues, which we restate as follows:

I. Did the trial court err by denying Appellant's motion to strike the appearance of the Office of the Public Defender due to a conflict of interest?

II. Did the trial court err by instructing the jury that unanimity was required in order to find Appellant not guilty?

III. Did the trial court err by not instructing the jury that Appellant could be found not guilty?

IV. Did the trial court err by allowing Officer Reynolds' oral and written hearsay testimony?

V. Did the trial court err by denying Appellant's motion to suppress the extrajudicial identification of Appellant by photographic array?

VI. Was the evidence sufficient to sustain Appellant's convictions?

## *Facts*

On May 28, 1991, Derek left his house at 6:15 a.m. to go to work. Derek noticed two men walk past him as he sat waiting for a bus. About two minutes later, the men returned and stood in front of him. One of the men, whom Derek later identified as Graves, pulled out a gun and said, "Don't move." At that moment, Derek saw his father, David, crossing the street. David testified that, upon seeing his son and sensing that something was not right, he crossed the street toward Derek and "asked what the trouble was." When the man holding the gun looked at David, Derek pushed the gun and ran down the street.

The police arrived at Derek's house three to five minutes later, and drove Derek through the neighborhood looking for the suspects. Derek told the police that one man wore light blue shorts, and the man with the gun wore red shorts and a white shirt. Later that morning the police arrested Kenneth Trusty (Trusty), who told the police that Graves was his accomplice. Derek identified Trusty as one of the men. From a photo array displayed to him by the police, Derek identified Graves's photo as that of the gunman. At trial, Derek and David identified Graves as the gunman.

## Discussion

### I.

### Conflict of Interest

In the case *sub judice*, Graves contends that he was denied his constitutional right of effective assistance of counsel because of a conflict of interest. Specifically, he argues that the trial court erred when it refused to grant his motion for mistrial and refused to strike the appearance of the Office of the Public Defender. The conflict of interest arose, according to Graves, when he was represented by an assistant public defender at the same time another assistant public defender represented co-defendant Trusty. The record is incomplete with regard to Trusty's case.

The right to counsel, under the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, includes the right to be represented by counsel who is free from conflicts of interest. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981); *Austin v. State,* 327 Md. 375, 609 A.2d 728 (1992); *Pressley v. State,* 220 Md. 558, 155 A.2d 494 (1959); *Kent v. State,* 11 Md.App. 293, 273 A.2d 819 (1971); *see also State v. Tichnell,* 306 Md. 428, 440, 509 A.2d 1179, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986) (no distinction between right guaranteed under federal constitution and the right to counsel ensured by Article 21).

To establish a violation of the constitutional right, "a defendant 'must establish that an actual conflict of interest adversely affected his lawyer's performance.'" *Austin*, 327 Md. at 381, 609 A.2d 728; (*citing Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980)); *Pressley*, 220 Md. at 562, 155 A.2d 494. The Supreme Court determined in *Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984), that "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." The Supreme Court stated that

[i]n certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance. Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S., at 345, 350, 100 S.Ct., at 1716–1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. *Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.* Even so, the rule is

not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'

Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice.

*Id.* at 692–93, 104 S.Ct. at 2067 (citations omitted) (emphasis added).

In *Brown v. State,* 10 Md.App. 215, 221, 269 A.2d 96 (1970), this Court set out general guidelines to determine whether an actual or imminent conflict of interest exists.

Within the facts of an individual case, it is proper to consider the complexity of both the law and the facts since the more complex a case becomes, either legally or factually, the more opportunity exists for a conflict of interest. Conversely, if the law is simple and the evidence of guilt strong, the opportunity for conflict of interest may be lessened. Of course, the contention may still be found to be an unsupported allegation ... or to have been waived at trial, ....

(Citations omitted).

■ Representation of multiple defendants in a criminal case, by the same attorney or law partners, is not *per se* an actual conflict of interest. *Austin,* 327 Md. at 386, 609 A.2d 728 (*citing Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718). The potential, however, for a conflict of interest is present. *See* Rules of Professional Conduct, 1.7–.10.

Generally, an actual conflict of interest exists when "an attorney, or law partners, represent in the same criminal case both the defendant and a codefendant (or other individual) who testifies adversely to the defendant." *Austin,* 327 Md. at 387, 609 A.2d 728; *Kent,* 11 Md.App. at 298, 273

A.2d 819 ("certain factual situations contain ingredients which inherently tend to create conflict of interest problems.... '[T]hose cases in which one attorney was simultaneously representing the defendant and a prosecution witness against the defendant, who was usually under indictment or awaiting sentence.' ").

The United States Court of Appeals for the Seventh Circuit explained in *Ross v. Heyne*, 638 F.2d 979 (7th Cir.1980), that

> [a]n actual conflict would arise where defense counsel is unable to cross-examine a prosecution witness effectively because the attorney also represented the witness. The problem that arises when one attorney represents both the defendant and the prosecution witness is that the attorney may have privileged information obtained from the witness that is relevant to cross-examination, but which he refuses to use for fear of breaching his ethical obligation to maintain the confidences of his client. 'The more difficult problem which may arise is the danger that counsel may overcompensate and fail to cross-examine fully for fear of misusing his confidential information.' A conflict of interest would also exist where one attorney represents co-defendants, and one defendant agrees to provide evidence against the other in return for an advantageous plea bargain.

638 F.2d at 983 (citations omitted) (*quoting United States v. Jeffers*, 520 F.2d 1256, 1265 (7th Cir.1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976)) (*cited in Austin*, 327 Md. at 387, 609 A.2d 728); *see also Kent*, 11 Md.App. at 299, 273 A.2d 819 (*prejudice to the accused, although slight, must be shown before such a conflict of interest will be deemed harmful error*).

██ Representation of co-defendants by members of a single law firm is treated the same, for purposes of conflict of interest analysis, as representation of co-defendants by one attorney. *Austin*, 327 Md. at 390, 609 A.2d 728. In *dicta*, the Court stated that "[w]ith regard to public defender offices, there appears to be some disagreement among

the cases as to whether, and to what extent, a public defender's office is to be viewed like a single private law firm for purposes of applying conflict of interest principles." *Id.* at 10 n. 3.

■ Before addressing the merits of Graves's argument, we are presented with the question whether, for purposes of conflict of interest analysis, to treat the representation of co-defendants by assistant public defenders the same as representation of co-defendants by one attorney, or a single law firm. It is clear that, under *Austin* and *Brown,* a conflict of interest would exist whenever private attorneys within the same firm simultaneously represent co-defendants, who are both either under indictment or awaiting sentence, when one co-defendant testifies against the other. Courts disagree whether to extend this *per se* rule to the public defender's office.

In *Allen v. District Court,* 184 Colo. 202, 519 P.2d 351 (1974), the public defender's office was assigned to represent a criminal defendant who provided crucial evidence against another individual represented by the public defender's office. The trial court denied the public defender's motion to withdraw, without a hearing to determine whether there was a conflict of interest. The appellate court held that a hearing should have been held.

> Whenever a motion to withdraw is filed on the grounds that a conflict of interest may exist or may arise in the future, the trial judge must conduct a hearing to determine if a conflict of interest, or a potential conflict of interest, requires that counsel withdraw. If, from the facts presented at the hearing, it appears that a substantial conflict of interest exists, or will in all probability arise in the course of counsel's representation, the motion to withdraw should be granted.

*Id.* at 353.

The court reasoned that all lawyers are ethically obligated to refrain from representing multiple clients if representation of a client will adversely affect another client. The

court stated it is "of the utmost importance that an attorney's loyalty to his client not be diminished, fettered, or threatened in any manner by his loyalty to another client." *Id.; see Rodriguez v. District Court,* 719 P.2d 699, 704 (Colo.1986) (Confidential information obtained by the assistant public defender for the defendant must be imputed to other members of the public defender's office.); *see also Espinoza v. Rogers,* 470 F.2d 1174, 1175 (10th Cir.1972) (A federal civil rights action wherein the Court stated that a "Colorado Public Defender's professional duties and responsibilities toward his clients are identical in all respects to any other Colorado attorney whether privately retained or court-appointed."); *cf. People v. Superior Court,* 94 Cal. App.3d 626, 629 n. 3, 156 Cal.Rptr. 487 (1979) (Although this case involved a law firm acting as public defender, the court stated "[n]othing before us indicates that the public defender has a financial interest in continuing to represent both real parties.").

Florida's appellate court expressly stated in *Turner v. State,* 340 So.2d 132, 133 (Fla.Dist.Ct.App.1976), that a public defender's office within a given circuit is the same as a "firm" for conflict of interest purposes and an assistant public defender may not represent a defendant if that representation will adversely affect another defendant. In *Babb v. Edwards,* 400 So.2d 1239 (Fla.Dist.Ct.App.1981), an assistant public defender certified to the trial court that representation of Babb conflicted with representation of another defendant. The trial court found, however, that the two assistant public defenders maintained separate offices in separate counties, and there was no danger that confidential information transferred between them. Citing *Turner,* the appellate court held that assistant public defenders are like members of a firm, but where the public defender's office is separate and the exchange of confidential information can be avoided, then public defenders are not analogous to a law firm. *Id.,* 400 So.2d at 1240.

The court stated that a public defender is required

to do more than merely ascertain that there is hostility or adversity between defendants represented by his office before filing a motion to withdraw; it is also his duty to ascertain, as a condition precedent to the filing of that motion, that counseling of such defendants by different members of the staff cannot be done "without conflict of interest".... If attorneys employed by the same public defender are not equated, for purposes of considering conflicts of interest, with private attorneys associated in the same law firm, then the factors ... relating to the protection of confidential information by separation of offices, facilities and personnel must be weighed by the public defender in the filing of a motion to withdraw.

*Id.* at 1241 (footnote omitted). Additionally, the court required trial courts to weigh such factors in deciding whether to grant or deny a motion to withdraw. *Id.; see Monson v. State,* 443 So.2d 1061, 1062 (Fla.Dist.Ct.App.1984) (when both public defenders were from the same circuit, the defendant was entitled to an evidentiary hearing to determine whether he was denied effective assistance of counsel due to a conflict of interest).

The Supreme Court of Pennsylvania, in *Commonwealth v. Via,* 455 Pa. 373, 316 A.2d 895, 898 (1974), held that the petitioner did not waive the failure to assert incompetency of trial counsel in a post-conviction proceeding in which the petitioner was assigned counsel who was a member of the same public defender's office which represented him at trial. The rationale underlying that court's decision was that "[t]he law will not assume that counsel has advised his client of his inadequacies or those of his associates." *Id.* Later, in *Commonwealth v. Westbrook,* 484 Pa. 534, 400 A.2d 160, 162 (1979), the court stated that the public defender's office is a "law firm" and that two members of the same firm are prohibited from representing multiple clients with inconsistent defenses.

In *Westbrook,* the defendant, charged with robbery, claimed that his brother committed the crime. At the preliminary hearing, the defendant and his brother were

jointly represented by members of the Public Defenders Association of Philadelphia, and the brother's public defender advised him not to testify at the defendant's trial. In an earlier decision, *Commonwealth v. Breaker*, 456 Pa. 341, 318 A.2d 354 (1974), the court summarized the law on conflicts of interest.

Our dual representation cases make several principles clear. First, "[i]f, in the representation of more than one defendant, a conflict of interest arises, the mere existence of such conflict vitiates the proceedings, even though no *actual* harm results. The potentiality that such harm *may* result, rather than that such harm *did* result, furnishes the appropriate criterion." Second, a defendant must demonstrate that a conflict of interest actually existed at trial, because "dual representation alone does *not* amount to a conflict of interest." Third, "[t]o make the dual representation rise to true conflict, appellant need not show that actual harm resulted, . . . but he must at least show the possibility of harm. . . ." Fourth, appellant will satisfy the requirement of demonstrating possible harm, if he can show, *inter alia*, "that he had a defense inconsistent with that advanced by the other client, or that counsel neglected his case in order to give the other client a more spirited defense."

*Breaker*, 318 A.2d at 356 (citations omitted) (emphasis in original); *see Westbrook*, 400 A.2d at 162.

The Superior Court of Pennsylvania concluded that " '[t]he only harm resulting from the alleged conflict took place long prior to appellant's trial and on the facts, no conflict existed at trial and thus no possible threat to appellant's interests was present.' " *Westbrook*, 400 A.2d at 162. The Supreme Court disagreed and concluded that "the existence of dual representation and the possible conflict of interest does not depend upon when the possible conflicting representation is performed (trial or pretrial), but rather that advice adverse to a client's interest was given." *Id.* at 163.

In *Commonwealth v. Green*, 379 Pa.Super. 602, 550 A.2d 1011, 1012 (1988), one co-defendant was acquitted and the other pleaded guilty in exchange for his testimony that the defendant participated in the burglary. The trial court ordered a new trial on the basis of a conflict of interest. The Commonwealth appealed arguing that members of the public defender's office work independently and, therefore, are not members of the same firm. The court rejected the Commonwealth's argument and concluded that a public defender's office is, "by its very nature, a law firm." *Id.* at 1013; *see Commonwealth v. Evans*, 306 Pa.Super. 25, 451 A.2d 1373 (1982) (Trial court erred when it denied motion to withdraw where co-defendants were each represented by assistant public defenders within the same county. A dissenting judge stated that the holding of *Cuyler*, 446 U.S. at 335, 100 S.Ct. at 1708, which only requires proof of actual harm, as opposed to potential harm, to establish a conflict of interest, should be adopted).

The Supreme Court of Utah determined in *State v. Smith*, 621 P.2d 697 (Utah 1980), that members of the same public defender's office may not represent defendants with conflicting interests as there is a strong likelihood that both have been privy to the confidences of the co-defendants. The court remanded the case for a new trial because there was no showing in the record that the defendant was advised of any conflict of interest.

Courts have held in other states that a public defender's office is not, *per se,* like a private law firm for conflict of interest purposes. In *State v. Bell*, 90 N.J. 163, 447 A.2d 525 (1982), the court refused to extend the presumption of prejudice to multiple representation by public defenders. In an earlier decision, *State v. Bellucci*, 81 N.J. 531, 410 A.2d 666 (1980), the court held that it is an improper conflict for a private attorney to represent one defendant while a partner or associate represents a co-defendant.

There is ready access to confidential information among members of a law firm. The close association of members heightens the risk of even inadvertent disclosure.

Each partner's professional knowledge is justifiably imputed to the entire firm, regardless of actual disclosure. The shared economic interest of the entire firm in the clients of individual members also supports treating a partnership as one attorney. A financial stake in the outcome of a case is itself a source of conflict. Perhaps most importantly, public confidence in the integrity of the bar would be eroded if conduct proscribed for one lawyer could be performed by his partner.

410 A.2d at 671 (citations omitted).

In *Bell*, the court determined that public defenders are unlike private firms since they have no financial interest in their clients. 447 A.2d at 528. "Because 'the primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State,' we can expect the public defenders to withdraw from the case whenever joint representation may prejudice their clients." *Id.* (citation omitted). Although the *Bell* court refused to adopt a *per se* rule, it required trial courts to determine whether a significant likelihood of prejudice existed.

[S]hould the circumstances demonstrate a potential conflict of interest and a significant likelihood of prejudice, the presumption of both an actual conflict of interest and actual prejudice will arise, without the necessity of proving such prejudice. We must therefore consider the record in this case to see if there was a significant likelihood of prejudice. We find there was not.

*Id.* at 529 (citations and footnote omitted). The dissent in this case urged that the *Bellucci* ruling as to private law firms should apply to public defenders from the same office to assure defendants their "fundamental right to independent counsel." *Id.* 447 A.2d at 537.

In *People v. Wilkins*, 28 N.Y.2d 53, 320 N.Y.S.2d 8, 268 N.E.2d 756 (1971), the Legal Aid Society, as attorney of record, represented the defendant and the complaining witness at the defendant's trial. The court refused to extend the rule—that knowledge of one member of a law firm will

be imputed by inference to all members of the law firm—to members of the Society. The court reasoned that, unlike a private law firm, confidential information does not flow freely within the office because it is so large (four branches, three units, and about 150 lawyers).

Illinois established a rule requiring a case-by-case inquiry by the trial court to determine if a conflict of interest exists, and the extent of any conflict. In *People v. Robinson,* 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157, 161 (Ill.1979), the court refused to conclude that a public defender's office is a "firm." The court determined that "such a *per se* rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel." *Id.* 37 Ill.Dec. at 272, 402 N.E.2d at 162. Accordingly, " 'the inbred adversary tendencies of the lawyers are sufficient protection' " from the presence of inadequate representation by separate members of the public defender's office. *Id.* (*quoting* ABA Standards, The Defense Function, Commentary, at 212–13 (1971)); *see also People v. Terry,* 46 Ill.2d 75, 262 N.E.2d 923 (1970); *People v. Smith,* 37 Ill.2d 622, 230 N.E.2d 169 (1967) (conflict of interest exists when a public defender represents a defendant in a post-conviction hearing based on charges of incompetent counsel afforded the defendant at trial by another public defender because of the public defender's competing loyalties between the office and defendant).

In *People v. Puckett,* 70 Ill.App.3d 743, 27 Ill.Dec. 244, 388 N.E.2d 1293 (1979), however, the court refused to hold that a public defender's office is the same as a law firm because the office in that case was decentralized (public defenders worked part-time and had private practices). The court explained that the case was unlike *Terry* and *Smith* because those cases involved centralized offices in which there was one public defender and several assistants who shared office space and functioned like a law firm. The court noted that the hearing conducted by the trial court on remand was exhaustive. Based on the evidence, the trial

court concluded that no conflict existed because there "[was] no common interest between the two individual practitioners other than that they [were] both lawyers, that they both [held] the title of Public Defender, they [were] both appointed by the court, and they [were] both paid by Adams County." *Id.* 27 Ill.Dec. at 247, 388 N.E.2d at 1296.

*People v. Miller,* 79 Ill.2d 454, 38 Ill.Dec. 775, 779, 404 N.E.2d 199, 203 (1980), requires a case-by-case inquiry "whereby it is determined whether any facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office." *See People v. Banks,* 121 Ill.2d 36, 117 Ill.Dec. 266, 269, 520 N.E.2d 617, 620 (1987) (The court explained that, unlike *Smith,* it is precisely because an assistant public defender's loyalty to his office is not as great as attorneys working for private law firms that it refused in *Robinson* to adopt a *per se* rule.); *see also People v. Wilkerson,* 123 Ill.App.3d 527, 79 Ill.Dec. 1, 5, 463 N.E.2d 139, 143 (1984); *People v. Nelson,* 82 Ill.2d 67, 44 Ill.Dec. 292, 411 N.E.2d 261 (Ill. 1980).

For the reasons discussed *infra,* we do not adopt a *per se* rule that a public defender's office is the same as a private law firm for conflict of interest purposes. We are not persuaded with the view that the public defender's office is, "by its very nature, a law firm." *Green,* 550 A.2d at 1013. Accordingly, an actual (or inherent) conflict of interest does not *per se* exist when assistant public defenders represent co-defendants (or other individuals) with inconsistent defenses. Although we do not adopt a *per se* rule, we regard the loyalty of each Maryland lawyer to a client to be of the "utmost importance," which is not to be "diminished, fettered, or threatened in any manner by his loyalty to another client." *Allen,* 519 P.2d at 353.

Disqualification of all members of the public defender's office where a conflict of interest exists will not result in the appointment of incompetent counsel, as the Court indicated in *Robinson,* 37 Ill.Dec. at 272, 402 N.E.2d at 162. We recognize that the Maryland Rules of Professional

Conduct do not include the "public defender's office" specifically within its definition of a "firm." Md.Rules of Professional Conduct, Terminology, ("firm" refers to lawyers in a private firm, lawyers employed in the legal department of a corporation or organization, or in a legal services organization); *see also id.* Rule 1.10, cmt. (lawyers employed in the same unit of a legal service organization refers to representatives of legal aid). Regardless, all members of the Maryland Bar are ethically obligated to represent clients competently. *Id.* Rule 1.1.

Moreover, we reject the premise that private firms differ from public defender's offices on the basis of a law firm's economic stake in the outcome of a case. *See Bell,* 447 A.2d at 528; *Superior Court,* 94 Cal.App.3d at 629, n. 3, 156 Cal.Rptr. 487. Public confidence in the integrity of the legal profession will surely erode if the predominant motivation for an attorney, public or private, to represent a client competently and ethically, is based on the fee earned, or the lack thereof.

Furthermore, our refusal to adopt a *per se* rule is not based on the idea that public defenders are any less loyal to their office than private attorneys. *See Smith,* 230 N.E.2d at 169. We simply cannot compare the degree of loyalty one public defender has toward the office as opposed to that which a private attorney has to his office.

■ Thus, we are not persuaded with the view of courts holding that at *no time* will a public defender's office be viewed as a law firm. Circumstances may justify a trial court's determining that confidential information obtained by assistant public defenders must be imputed to other members of the public defender's office. *See Allen,* 519 P.2d at 353; *Babb,* 400 So.2d at 1240; *Westbrook,* 400 A.2d at 163; *Bell,* 447 A.2d at 529.

Article 27A, § 8 of the Annotated Code of Maryland (1990) provides:

**Privileged communications.**

All communications between the individual defendant and any person in or engaged by the Public Defender shall be fully protected by the attorney-client privilege to the same extent and degree as though counsel had been privately engaged....

The *Babb* Court had before it § 27.53(3), Florida Statutes (Supp.1980) which provided:

If at any time during the representation of two or more indigents the public defender shall determine that the interests of those accused are so adverse or hostile that they cannot all be counseled by the public defender or his staff *without conflict of interest,* or that none can be counseled by the public defender or his staff because of conflict of interest, it shall be his duty to certify such fact to the court, and the court shall appoint one or more members of The Florida Bar, who are in no way affiliated with the public defender, to represent those accused.

[Emphasis added].

■■■ The statute codifies for Florida what we believe is clearly the law of Maryland; therefore, we adopt from *Babb* the following for the guidance of the Public Defender's office when faced with a conflict of interest:

[T]hat attorneys employed by a public defender who are required to "practice their profession side by side, literally and figuratively" are members of a "firm" for purposes of the rule.... [W]here the practice of each attorney is so separated from the other's that the interchange of confidential information can be avoided or where it is possible to create such a separation, there need be no relationship between them analogous to that of a law firm and there would be no inherent ethical bar to their representation of antagonistic interests....

[T]he above language should be construed to require the public defender (or assistant public defender representing a particular defendant) to do more than merely ascertain that there is hostility or adversity between defendants represented by his office before filing a mo-

tion to withdraw; it is also his duty to ascertain, as a condition precedent to the filing of that motion, that counseling of such defendants by different members of the staff cannot be done "without conflict of interest," as provided by the statute. If attorneys employed by the same public defender are not equated, for purposes of considering conflicts of interest, with private attorneys associated in the same law firm, then the factors discussed above relating to the protection of confidential information by separation of offices, facilities and personnel must be weighed by the public defender in the filing of a motion to withdraw. And such factors must be weighed by the trial court in its determination as to whether or not such motion should be granted.

(Footnotes omitted).

 Article 27A, § 3(b)(1) of the Annotated Code of Maryland requires the Public Defender to appoint a district public defender for each district of the District Court. Section 3(d) requires the Public Defender to establish and maintain suitable offices within the State, and at least one such office in each district. Section 6 authorizes each district public defender to appoint a panel attorney to represent an indigent defendant, while reserving power to the court to appoint counsel where there is a conflict in representing multiple defendants. For the purposes of this opinion, district offices of the district public defender are analogous to independent private law firms.

 In every case where a public defender's office represents two or more co-defendants, there is a potential for conflict of interest. Where a public defender concludes that a potential conflict of interest is such that it is required that other counsel be assigned, the case may be assigned to a panel attorney, or the court may be requested to assign counsel. In addition, there is nothing in the law to prevent the case from being transferred to another district public defender's office. The public defender may make changes within a specific office that could sufficiently insulate, from

each other, assistant public defenders who operate from the same office and who are simultaneously representing co-defendants. These institutional changes could include early screening of the cases, structural and procedural separation of the units, assignments to completely separate units in the same office, and other innovations in the handling of cases involving co-defendants that would be conducive to the avoidance of any conflict of interest.

The public defender should, and probably will, anticipate the fact that individual co-defendants tend to make early deals with the prosecutor at the expense of a *particeps criminis.* Early action may be required of the public defender to prevent a prejudicial conflict that could severely taint the prosecution of the co-defendant who was late in getting to the prosecutor's office.

When the issue is raised by the court, the Public Defender, the State or a defendant, the trial court, in determining whether there is a conflict of interest, should

1. determine whether attorneys employed by the same public defender's office can be considered the same as private attorneys associated in the same law firm;

2. weigh factors relating to the protection of confidential information by considering whether there are separate offices, facilities and personnel; and

3. determine whether, as a consequence of having access to confidential information, an assistant public defender refrained from effectively representing a defendant.

*See Babb,* 400 So.2d at 1241. We do not intend that the three considerations set out above should in any way limit the court in its determination of whether a conflict of interest exists. When the potential conflict is brought to the attention of the court, it must conduct a full evidentiary hearing to determine if "facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office." *Miller,* 404 N.E.2d at 203.

██ In the case *sub judice*, the record shows that on August 13, 1991, the State sought to postpone the case in order to consolidate ˙ co-defendant Trusty's case with Graves's case. A different assistant public defender represented Graves at that time. According to the assistant public defender who represented Graves at trial, Trusty was represented by that office on August 15, 1991. The assistant public defender moved for a mistrial at the beginning of Graves's trial on the basis of a conflict of interest. The assistant public defender stated:

the co-defendant at some point in time names Mr. Graves as his co-defendant—factual conflict and, Your Honor, it is the policy of our office not to represent co-defendants in these matters. Additionally, Your Honor, our office no longer has the power to panel attorneys when a conflict arises....

The court then asked Graves if he had any questions. Graves replied:

As she told you, it's not much can be done because the law's the law. I want to have a lawyer, but I wouldn't want to put her in no type of jeopardy not myself. Just want to let the truth show, so Your Honor, have to give me another attorney then I have to go there.

The court asked the State whether it intended to call Trusty to testify, and the State responded, "No, sir. The State does not." The trial judge denied the motion after stating "it's a serious conflict, but what is clear to me is you had it three months ago and we have sworn a jury."

In reaching our decision, we are confronted with the problem of having an incomplete record. There is no information about Trusty's representation, other than the State's proffer at Graves's trial that Trusty "pled guilty in a knowing and voluntary plea last summer." The record is void of any information concerning Trusty's plea negotiations with the State. *See Westbrook*, 400 A.2d at 163 (possible conflict of interest does not depend on when the conflicting representation is performed, but rather that adverse advice is given). Specifically, the record does not

indicate whether an assistant public defender advised Trusty not to testify, or gave any other advice adverse to Graves after he was indicted, and during the period while the case was postponed. *See Kent,* 11 Md.App. at 299, 273 A.2d 819. We are unable to ascertain whether he was awaiting sentencing when he plead guilty, and we do not know what, if any, information was related between each member of the public defender's office at that time.

The nature of Trusty's plea arrangement, as well as whether Trusty's statement to the police was voluntary, are pertinent to this inquiry. Also important is the extent to which Graves's counsel refrained from involving Trusty in Graves's trial. In general, the extent to which any prejudice may have rendered Graves's representation ineffective is a question that remains unanswered. Even though Trusty did not testify at trial, the record fails to resolve the issue whether a conflict of interest arose pre-trial which prejudiced Graves at trial.

In any event, the record makes clear that the court found that a conflict of interest arose between the assistant public defenders, but it failed to explore fully the nature and extent of any conflict. Evidence was not produced which could have assisted the court in determining whether actual harm to Graves occurred pre-trial. "The court's omission could have been remedied easily at a hearing on the motion.... '[P]utting the cart before the horse may sometimes be easier to do, but it does make the ultimate journey considerably more difficult.' " *McMillian v. State,* 65 Md. App. 21, 30, 499 A.2d 192 (1985).

Therefore, we remand this case to the trial court for an evidentiary hearing to determine whether a conflict of interest existed and whether the conflict, if any, prejudiced Graves at trial. On remand, should the court find that no conflict of interest existed, then the judgments will stand. If the court determines that a conflict of interest did exist, and that conflict prejudiced Graves's trial, it should vacate the judgments and award a new trial. We discuss Graves's

remaining issues, *infra,* should the court determine that no conflict of interest existed.

## II. & III.

### *Jury Instructions*

■ Graves next argues that the court erred when it instructed the jury that a verdict of not guilty must be unanimous. He claims that unanimity is only required to find a verdict of guilty. Graves contends that the trial judge erred when he instructed the jury that:

> the concurrence of the 12 minds of the jury is necessary in order to find the defendant guilty and it is necessary to find the defendant not guilty. . . .

He also complains that the trial judge erred by not instructing the jury that Graves could be found not guilty of assaulting Derek, and separate from that verdict, that he could be found not guilty of assaulting David. He claims that the trial court erred when it instructed the jury that:

> After full and fair consideration and deliberation you are convinced beyond a reasonable doubt that the State has proven this offense, then you should find the defendant guilty of assault as to Derek Jones as well as to David Jones, Jr. On the other hand, unless you are convinced beyond a reasonable doubt, then you must find the defendant not guilty.

We affirm.

Rule 4–325(e) provides that:

> **Objection.**—No party may assign as error the giving or the failure to give an instruction *unless the party objects on the record* promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

(Emphasis added). The record shows that Graves did not object to either instruction. As a result, Graves failed to preserve these issues for appeal. Graves concedes that he failed to object to the court's instructions, but urges this Court to exercise its discretion pursuant to Rule 4–325(e) because the court's instructions constituted plain error. We refuse to do so. *See Austin v. State,* 90 Md.App. 254, 600 A.2d 1142 (1992) (appellate court's discretion to overlook nonpreserved instructional error is plenary; it may decline to consider even plain and material error).

### IV.

#### *Hearsay*

Graves next argues that the trial court erred when it admitted Officer Reynolds's oral and written hearsay testimony. He contends that the court erred when it permitted Officer Reynolds to testify on direct examination that codefendant Trusty identified Graves as his accomplice, and when it admitted Officer Reynolds's notebook into evidence. Graves argues that the notebook was inadmissible because it was the officer's personal notes and not a business record. He complains that the admission of "double hearsay" violated his right of confrontation under the federal constitution and Article 21 of the Maryland Declaration of Rights.

Rule 4–323(a) provides in pertinent part:

The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly.

"[E]ven though it is not necessary to state the grounds for objection to evidence, when counsel is requested by the trial court to articulate the reasons for that objection, he should state *all* his reasons for objecting. If in articulating the reasons for the objection counsel omits to state a particular ground, he is ordinarily regarded as having waived any basis not so stated." *Ross v. State,* 24 Md.App. 246, 259,

330 A.2d 507 (1975) (*citing Wilt v. Wilt*, 242 Md. 129, 218 A.2d 180 (1966)) (emphasis in original), *rev'd on other grounds*, 276 Md. 664, 350 A.2d 680 (1976).

At trial, Officer Reynolds testified about the events that took place immediately after the alleged assault.

[State]: Did you have an opportunity to talk to the one in the —?

[Officer]: Yes.

[State]: And about what did you talk to him?

[Officer]: About the other individual.

[State]: Which other individual?

[Officer]: The one that was still at large.

[State]: Did he give you a name —?

[Defense counsel]: Objection.

The Court: Overruled.

[Officer]: Yes. He said his name was Michael Graves.

[State]: What did you do with that name?

[Officer]: I recorded it in my small—I carry a small notebook with each date of when I work and my car number and I recorded the name.

[Defense counsel]: Objection.

After the State moved to admit the notebook into evidence, the court requested defense counsel to state the reasons for her objection. She explained:

These are his personal notes. It's not quite in the normal course of business. This doesn't reflected [sic]—necessarily for police officers on duty to keep this particular type of report and notebook. These are his personal notes. It's just a name there, no other identification. This is just a name he jots down.

I don't think this is kept during the course of business. This a personal book. The—have an opportunity to ask questions about this book. I just don't think that's considered a business record for the purposes of having it admitted at this point into evidence.

The State proffered that "there's nothing personal about it. It's the book that he keeps in conjunction with his work." The court then admitted the entire notebook into evidence.

■ Clearly, the sole ground for objecting to the admission of the notebook was that it was not a business record. The issue of whether Graves's confrontation rights were violated was not preserved. The only issue properly before this Court is whether Officer Reynolds's oral and written statements were admissible under the "business record" exception to the hearsay rule.

Section 10–101 of the Courts and Judicial Proceedings Article provides:

(a) *Definition of "business"*.—"Business" includes business, profession, and occupation of every kind.

(b) *Admissibility.*—A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.

(c) *Time of making records.*—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

(d) *Lack of knowledge of maker.*—The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility.

Md.Cts. & Jud.Proc.Code Ann. § 10–101 (1989). The Court of Appeals stated in *Ali v. State*, 314 Md. 295, 304, 550 A.2d 925 (1988), that:

Hearsay is generally defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Thus, when a statement is offered for some purpose other than to prove the truth of the matter asserted therein, it is not hearsay. Words heard by a police officer in the course of an investigation and properly recorded in a police report may, for example, be

admissible because they prove a libel, or because they prove that the declarant was alive at a particular time. In such cases, the evidence is offered simply to prove that the words were spoken, and not to prove the truth of the matter asserted by the declarant. For that limited purpose, the evidence is admissible without requiring the presence of either the declarant. . . .

(Footnote omitted); *see Holcomb v. State*, 307 Md. 457, 461–62, 515 A.2d 213 (1986) ("[T]hose portions of the report of a police investigation which record the facts obtained by the direct sense impressions of the investigating officer are admissible as a business record while those portions which report objectionable hearsay and opinions of the investigator are inadmissible as a business record.").

In the case *sub judice,* two police officers testified: Officer Reynolds, who conducted the initial investigation; and Officer Moore, who arranged the pre-trial photo array that was subsequently shown to Derek. Officer Reynolds testified that he voluntarily kept a notebook which recorded the same information as the official log. He testified that he kept the notebook in his locker at work; that he included in his notebook the date of each shift, the number of the vehicle driven during the shift, the model of the vehicle and gas card number; and, that he recorded information obtained during all calls each shift, including names and complaints. He stated that he made entries in the notebook on a daily basis. Thus, the notebook was kept in the regular course of his police business. The court did not err in admitting the notebook into evidence under § 10–101.

 The record does not make clear if Officer Reynolds's oral testimony, that Trusty told him his accomplice was Michael Graves, was offered for the truth (i.e., that Graves was in fact Trusty's accomplice), or was offered merely to show how the police were able to include Graves's photo in the photo array that Officer Moore presented to Derek. The State did not proffer a reason for offering Officer Reynolds's oral statement into evidence. Defense counsel did not request a limiting instruction for admitting

the notebook. If Officer Reynolds's testimony was offered for the truth, then it was hearsay, and therefore, inadmissible. If such was the case, the notebook would have still been admissible, but the underlying hearsay should have been redacted. If the testimony was offered for the limited purpose of showing how the police put together the photo array, and merely that the words were spoken, then under *Ali,* Trusty's spoken words that were recorded in the notebook were admissible under the business record exception.

Officer Reynolds testified that after he received Graves's name, he recorded it in his notebook. Officer Moore, who testified after Officer Reynolds, explained that he was responsible for the follow-up investigation of the alleged assault involving Derek and David. He stated that during the course of his official investigation he received the name of Graves as a possible suspect and that he used the name to assemble a six photo line-up. Neither officer testified that Graves was *in fact* Trusty's accomplice; rather, each officer testified that, upon receiving the name, it was used to proceed with the investigation and to prepare a photo-array. Therefore, we conclude that Trusty's out-of-court statement was properly allowed for the limited purpose of showing how the police assembled the photo array.

 Even if we determined that the court erred in admitting the oral and written statements, the error was harmless.

The Court of Appeals explained in *Dorsey v. State,* 276 Md. 638, 647, 350 A.2d 665 (1976), that "appellate review . . . is subject to tenets that a judgment may be affirmed, under certain circumstances, despite errors committed in the conduct of the trial. Such rules in their application represent appellate judgments that a retrial is not justified if the error has not affected the rights of the parties." (Footnote omitted). Thus, the test enunciated in *Dorsey* is that

> when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent re-

view of the record, is able to declare a belief beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Id.* at 659, 350 A.2d 665 (footnote omitted).

In *Dorsey*, "appellant's conviction rested exclusively upon the in-court identification by [the victim]," who identified two different persons at two different times. *Id.* at 660, 350 A.2d 665. In a later case, *Richardson v. State*, 324 Md. 611, 598 A.2d 180 (1991), the Court of Appeals held that the trial court's admission of multiple hearsay constituted reversible error. There, defense counsel sought to establish, through cross-examination of an officer, that appellant was not with the victim at a certain time, thereby having an alibi as to certain offenses. Counsel questioned the officer about the *times* another suspect told him that appellant called and met with the suspect. On redirect, the State questioned the officer about the *content* of the conversations, and also elicited additional levels of hearsay including having the officer read another officer's report that contained two suspects' statements relating to the appellant's admissions.

The Court determined that the testimony was inadmissible, and further concluded that

[g]iven the somewhat tentative nature of [the victim's] identification and her initial description of two or three different individuals who assaulted her, we cannot conclude beyond a reasonable doubt that the error was harmless.

*Id.* at 624, 598 A.2d 180; *see also Johnson v. State*, 321 Md. 694, 698, 584 A.2d 700 (1991) (error in court's refusal to allow appellant to impeach victim's testimony not harmless where victim identified appellant " 'by photo within days of

the incident' " but was unable to identify appellant in court, and issue of criminal agency was heart of defense).

In the case *sub judice*, unlike *Dorsey*, *Richardson*, and *Johnson*, Graves was positively identified on four occasions. Derek identified Graves as one of the assailants while driving with the police through the neighborhood. Shortly thereafter, Derek picked Graves's photo from the photo array and identified him as the gunman. At trial, Derek and David each identified Graves as the gunman. Thus, under *Dorsey*, we conclude that any error committed by the trial court when it admitted into evidence the officer's oral and written statements was harmless beyond a reasonable doubt.

## V.

### *Motion to Suppress*

Graves next argues that the photo array was unnecessarily suggestive and that any showing of reliability by the State did not outweigh its suggestiveness. Specifically, he complains that the photo array was suggestive because Derek gave the police only a clothing description, and the clothing and facial shape and features of the photos included were not identical. We disagree.

To determine the admissibility of an extrajudicial identification, it is well-settled that the "defense has the initial burden of showing some unnecessary suggestiveness in the procedures employed by the police." *Loud v. State*, 63 Md.App. 702, 706, 493 A.2d 1092 (1985). "If and when a *prima facie* taint is evident, the State must prove by clear and convincing evidence the existence of reliability in the identification that outweighs the corrupting effect of the suggestive procedure." *Id.* "Reliability, not suggestiveness, is the linchpin in making the determination of admissibility and thus avoiding any substantial likelihood of misidentification." *Id.* at 707, 493 A.2d 1092. Five factors are used to determine the reliability of an extrajudicial identification:

"[t]he opportunity of the witness to view [1] the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation."

*Id.* at 706, 493 A.2d 1092 (*quoting Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

Office Moore testified at the suppression hearing that he obtained a "BFI" photo of Graves and included it with five other photos of African–American men, the same approximate age as Graves. Derek testified that the photos varied in facial shapes and features. He noticed that Graves's photo, number three, differed from number four in the shape of the head and nose; it differed from number two in the forehead, the nose, and the shape of the face; it differed from number four in the shape of the head, the mustache, and the nose; it differed from number five in the forehead, the shape of the head, and the nose; and it differed from number six in the facial hair and the shape of the head. Considering each photo was a African–American male, the same approximate age as Graves, any differences among the photos as discussed in the record are *de minimis.*

Even if we assume Graves met the initial burden of showing unnecessary suggestiveness, the identification under the totality of the circumstances was reliable. *See Brockington v. State,* 85 Md.App. 165, 173, 582 A.2d 568 (1990). Derek testified that no one pressured him to make the identification, and that he could "recall the incident on that moment[,] ... and visualize what happened." According to Derek, Officer Moore "showed me the photos and asked me to identify anybody who I thought [sic] at that time. I should pick out the person[.]" Officer Moore testified that he gave Derek the "photo lineup card" which explained that the photo array "may or may not contain a picture of the suspect involved in this crime." Derek identified Graves in photo number three. Although he initially

gave the police only a clothing description of his assailants, the police apprehended Trusty as a result of Derek's description, and Derek identified him as one of the two assailants. We hold that the court correctly denied Graves's motion to suppress and properly admitted Graves's photo into evidence.

## VI.

### *Sufficiency of Evidence*

■ Finally, Graves contends the evidence was insufficient to support the jury's finding beyond a reasonable doubt that Graves committed the alleged assault. He maintains that Derek's identification of Graves is flawed because he did not have a sufficient opportunity to observe his assailant; his description of the assailants was uncertain and inaccurate; Derek and David were not credible witnesses; and Derek and David influenced each other's identification since neither could have independently identified Graves.

Rule 4–324 provides in pertinent part:

(a) **Generally.**—A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. *The defendant shall state with particularity all reasons why the motion should be granted.* No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case. . . .

(c) **Effect of Denial.**—A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not granted, without having reserved the right to do so and

to the same extent as if the motion had not been made. In so doing, the defendant withdraws the motion.

(Emphasis added).

In the case *sub judice,* defense counsel made a motion for judgment of acquittal at the close of the State's case. The reason she gave was that the evidence was insufficient to prove that Derek knew Graves tried to rob him, since the same facts were used to support both the attempted robbery and assault charges of which he had been acquitted. The court denied the motion. After the defense presented its case, and at the close of all the evidence, counsel renewed the motion for judgment of acquittal.

Your Honor, I renew my motions [sic] and at this point I would simply point out that particularly with any identification made by Mr. David Jones, I don't think the State has at this point made a case for an assault on David Jones, and I renew my motion with respect to the assault on Mr. Derek Jones as well as the attempted robbery, that there's still not enough—the State hasn't—enough to support any case with respect to the attempted robbery. Your Honor, I would ask the court, if the court finds there's enough evidence with respect to the assault then at this point—grant my motion with respect to the attempted robbery—same facts, the same particular incident, that assault necessary to go along with the robbery, and if the court finds that there's enough for the attempted robbery, that my motion be granted with respect to the assault on Derek Jones in this case.

Defense counsel failed to preserve the identification issue which is raised for the first time in this appeal as a basis for insufficiency. *See, e.g. State v. Lyles,* 308 Md. 129, 135–36, 517 A.2d 761 (1986); *Muir v. State,* 308 Md. 208, 218–19, 517 A.2d 1105 (1986). Rule 4–324 requires that counsel state "with particularity all the reasons why the motion should be granted[.]" At no time did she give as a reason the inability of Derek to identify Graves as his assailant. *Cf. Warfield v. State,* 315 Md. 474, 487, 554 A.2d 1238 (1989) (second motion for judgment of acquittal was insuffi-

ciently particularized standing alone, but motion incorporated reasons previously given). We affirm the ruling of the trial court because counsel's "failure to particularize the reasons for granting a motion for judgment of acquittal in accordance with the rule's requirements necessarily ... result[s] in a failure to preserve the issue for appellate review." *Muir*, 308 Md. at 219.

CASE REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION AS TO ISSUE I; JUDGMENT OTHERWISE AFFIRMED AS TO ISSUES II THROUGH VI; COSTS TO BE PAID ¾ BY APPELLANT AND ¼ BY MAYOR AND CITY COUNCIL OF BALTIMORE.