806 A.2d 682

**Marvin JENKINS**

v.

**STATE of Maryland.**

**Nos. 1121 and 1122, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Sept. 4, 2002.

84

**86**

90

Sherrie B. Glasser, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Zoe Gillen White, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Douglas Gansler, State's Attorney for Montgomery County, Rockville, on the brief) for appellee.

SONNER, DEBORAH S. EYLER, and SHARER, JJ.

DEBORAH S. EYLER, J.

A jury in the Circuit Court for Montgomery County convicted Marvin Jenkins, the appellant, of second degree murder and use of a handgun in the commission of a crime of violence in the shooting death of Steven Dorsey, Jr. The appellant also was convicted of attempted first degree murder, attempted second degree murder, and first degree assault on Michael Clark, who was with Dorsey when he was shot.

The court sentenced the appellant to a term of thirty years imprisonment for second degree murder; a consecutive ten-year term for use of a handgun in the commission of a crime of violence; a consecutive twenty-year term for attempted first degree murder; and a concurrent twenty-year term for first degree assault. The court merged the attempted second degree murder conviction.

On appeal, the appellant presents five questions for review, which we have rephrased:

I. Did the trial court err in denying the appellant's motion for new trial filed, *inter alia,* on the ground of an improper contact between a State's witness and a juror during the trial?

II. Did the trial court err in admitting into evidence certain statements made in the presence of witness Alfred Smith?

III. Did the motion court err in denying the appellant's motion to suppress evidence?

IV. Did the sentencing court err by not merging the conviction for assault with the conviction for attempted first degree murder?

V. Was the evidence sufficient to sustain the appellant's convictions?

For the following reasons, we shall affirm the judgments of the circuit court, except that we shall vacate the appellant's sentence for first degree assault.

## FACTS AND PROCEEDINGS

Steven Dorsey, Jr., and Michael Clark spent most of the day and evening of April 13, 2000, together, smoking PCP and marijuana. By late that night, they were on Spring Street, near its intersection with Douglas Street, in the Lincoln Park area of Montgomery County. Clark saw two men walking toward them. He did not know or recognize either man. One of the men, later identified as David Barnett, addressed Dorsey, saying, "Just the nigger I'm looking for." Dorsey responded, "I still got that for you." According to Clark, one man walked over to a car while the other man, a "dark skinned guy[,] . . . just started shooting."

Clark fled. Dorsey started running in the other direction. As Clark was running, he heard five or six shots, and realized that Dorsey was no longer running. Clark ran to a nearby home and banged on the door. When no one answered, he

returned to the scene of the shooting and found Dorsey lying on the ground. The police arrived a few minutes later.

The appellant and Barnett were charged with numerous crimes arising out of the shooting incident. They were tried separately. At the appellant's trial, Clark testified for the State, and identified the appellant as the man who had walked over to the car, while the other man started shooting. Clark further testified that the appellant did not say anything during the encounter.

Additional facts will be recited as pertinent to our discussion of the issues.

## DISCUSSION

### I

The appellant's trial started on March 19, 2001, and concluded on March 30, 2001.

Jury selection took place all of March 19 and part of March 20. After the State and the defense had chosen jurors and indicated satisfaction with the panel, but before the jurors were sworn, the court told the jurors, *inter alia:*

> [Y]ou must do everything reasonable within your power to avoid contact with any of the witnesses, parties, or persons you see in close contact with them outside of the courtroom.
>
> Don't let anybody speak to you about this case, and don't speak to anyone about it yourself. . . .

The jurors were sworn and the court then gave them detailed general instructions to follow during the trial. Those instructions included the following:

> Do not have any contact outside the courtroom with any of the parties, witnesses, or lawyers. . . .
>
> If anything does occur, contrary to these instructions, please write a note as soon as possible. Do not discuss it with any other member of the jury, and give it to my law clerk, Ryan, and he will bring it to my attention.

Again, upon any recess, as I mentioned, do not discuss the case with anyone or let anyone discuss the case with you or in your presence. . . .

In addition, please avoid any contact with the parties, lawyers, and witnesses involved in this case.

On March 21, the State called Detective Patricia Pikulski as a witness. Pikulski, who is assigned to the homicide unit of the Montgomery County Police Department, was one of the officers who responded to the scene of the shooting. She testified that she arrived at the scene at about 12:20 a.m. About ten minutes later, she interviewed Clark, who was sitting in the back seat of a police cruiser. The interview lasted about 45 minutes. During the interview, Clark described the two men involved in the shooting. Pikulski testified about the descriptions Clark gave her of the two men.

During her interview of Clark, Pikulski took notes. On cross-examination, her notes were marked as a defense exhibit, and she was questioned about them. On re-direct examination, Pikulski read her notes into evidence.

At the conclusion of Pikulski's testimony, the court reminded her that she was under subpoena. The court stated, "There is a rule on witnesses so don't discuss your testimony with any other witness or permit any other witness to discuss their testimony with you. We will notify you if we need you at a future time."

On April 4, 2001, five days after the jury returned its verdict, Pikulski went to the State's Attorney's Office on an unrelated matter. She saw Deborah Armstrong, Esq., the prosecutor in the appellant's case, and walked over to say hello. In the course of their conversation, Pikulski commented to Armstrong that while the trial had been in progress, she had had an inadvertent encounter with one of the jurors, Bruce McDonald, at a religious retreat held in Virginia.

Upon learning this information, Armstrong immediately contacted the court and defense counsel and requested an emergency hearing. The emergency hearing was held the next day, April 5, 2001. At the hearing, Armstrong disclosed

what Pikulski had told her, and asked the court to summons McDonald to court so he could be questioned about his contact with Pikulski during the trial. After conferring with counsel, the court scheduled an evidentiary hearing for April 19, 2001.

On April 9, 2001, the appellant filed a ten-day motion for new trial, under Md. Rule 4–331(a). He asserted as one basis for the motion that there had been an improper contact between Pikulski and McDonald during the trial that had prejudiced him and deprived him of his Sixth Amendment right to a fair trial. Specifically, the appellant argued that the contact had enhanced the credibility of the police in McDonald's eyes, when the defense was challenging police credibility with assertions that the police had conducted a sloppy investigation and had ignored key evidence favorable to the appellant. The appellant also argued that Pikulski and McDonald had deprived him of his right to know about the contact during the trial, by not bringing it to the court's attention during trial, in contravention of the court's instructions.

At the April 19, 2001 hearing, Pikulski testified as an adverse witness, called by the appellant. McDonald was called and examined by the court.

Pikulski stated that on Friday and Saturday, March 23 and 24, 2001, she attended a religious retreat in Virginia. The topic of the retreat was "Contemplation, Silence, Beauty and the Holy." She arrived at the retreat location at about 6:50 p.m. on March 23. About ten other people were present. Shortly after arriving, she started talking to a man named Bruce McDonald. She did not recognize him as someone she knew or ever had had contact with. After several minutes, McDonald walked away.

About ten minutes later, McDonald returned to where Pikulski was standing and said either that he "was" or "is" "on the jury." Thinking he had used the word "was," Pikulski responded, "Oh, you're one of the ones that convicted him?" McDonald replied, "I can't talk about it." Pikulski thought that was odd, and then asked whether McDonald was on the

jury in the trial that was "right now?" McDonald responded, "Yes." Pikulski then said, "You're right. We can't talk about this."

The people attending the retreat went home Friday night and returned Saturday morning. The retreat was supposed to last until 7:00 p.m. on Saturday, but concluded early, at 1:30 p.m. McDonald and Pikulski had a brief discussion, and McDonald suggested they have lunch together. She agreed and the two walked to a restaurant a few doors down from where the retreat had been held.

At lunch, Pikulski and McDonald talked about their families and discussed other personal topics. Pikulski learned that McDonald was a volunteer at the soup kitchen where she attends Sunday school. They did not talk about the appellant's case and Pikulski did not discuss her work or the police force in general. Pikulski and McDonald paid for their own meals. Pikulski then drove McDonald to his car. She was driving her own personal car, not a police car.

On Monday, March 26, 2001, Pikulski told Detective Kenneth Penrod, her superior, about her encounter with McDonald at the retreat. She did not contact the State's Attorney's Office because she did not think there was any problem with her talking to a juror in a case that was in trial, so long as they did not discuss the case itself.

Pikulski acknowledged that even though she already had testified in the appellant's trial by the time of the retreat, she was under subpoena and could have been recalled to the stand.

McDonald testified that he attended the religious retreat in Virginia on March 23 and 24, 2001, with about 25 to 30 other people. On the evening of March 23, as the attendees were getting acquainted, he saw Pikulski and recognized her as a detective who had testified at the trial. At first, he walked away from her, because he wasn't sure what he should do. He then approached the detective and said, "Look, you don't know who I am, but I'm a juror in a case that you testified in, and I can't have any dealings with you." Pikulski responded, "Oh, did you, you know, did you find him guilty?" Taking Pikul-

ski's remark to mean she thought he was a juror in a trial that had ended, *i.e.*, not in the appellant's trial, McDonald replied that the trial still was in progress.

McDonald and Pikulski did not discuss the matter any more. They did discuss general topics. The next day, they sat next to each other during the seminar, not by design, and then went to lunch together. They were alone for most of the meal, although at some point a friend of McDonald's entered the restaurant and joined them for a short time. During lunch, Pikulski and McDonald discussed McDonald's work, which is in environmental matters, and Pikulski commented that her son was in the process of obtaining a degree in chemistry, a field he had become interested in by virtue of his interest in the environment.

When their lunch was over, Pikulski offered to drop McDonald off at a car dealership where his car was being repaired. He accepted her offer. The dealership was about a half mile from the restaurant. After taking McDonald to his car, Pikulski went on her way, and the two had no more contact.

The court did not ask McDonald any questions about why he did not bring his contact with Pikulski to the court's attention, during the trial; and the court was not asked by either counsel to make any such inquiry of McDonald.

The State filed an opposition to the appellant's motion for new trial. The court held a hearing on the motion on June 20, 2001. On July 16, 2001, the court issued a written opinion denying the motion.

The court found that the contact between Pikulski and McDonald had occurred inadvertently, not intentionally, at least initially, but that it nevertheless was contrary to its instructions and therefore was improper. Applying the test articulated in *Allen v. State,* 89 Md.App. 25, 597 A.2d 489 (1991), the court then analyzed whether the improper contact had prejudiced the appellant's defense.

The court concluded that, even if it presumed prejudice from the improper contact, the State had rebutted the presumption, and "[the appellant's] right to a fair trial and right to a fair and impartial juror, was not in any way impaired ... by the contact that occurred." The bases for the court's ruling on the issue of prejudice were as follows.

The court found accurate and credible McDonald's testimony about the substance and nature of his contact with Pikulski. It concluded that the only communication between the two that possibly was about the trial was Pikulski's question ("did you find him guilty?") that McDonald took as a reference to another trial, not to the appellant's trial. The court found that Pikulski's involvement as a witness in the appellant's case had been minimal, and therefore it was *"extremely* unlikely that Mr. McDonald could or would have assumed that the 'other trial' [the detective was referring to] was that of [the appellant's] co-defendant, Mr. Barnett." (Emphasis in original.) The court further found that even if McDonald had assumed that the "other trial" was Barnett's trial, Pikulski's question would not have harmed the appellant in his defense, because the appellant's defense was predicated on Barnett's having been the shooter. Indeed, part of the defense theory was that the appellant was a victim of mistaken identity and that Barnett had committed the murder with his (Barnett's) brother, not with the appellant. Barnett's having been found guilty was consistent with that theory.

The court also found that while the contact between Pikulski and McDonald had made Pikulski more credible in McDonald's eyes, the enhanced credibility "would have worked in the [appellant's] favor." Not only did the defense not challenge Pikulski's credibility at trial, it adopted her testimony in several respects and attempted to use it to discredit Michael Clark, the State's primary witness.

Finally, the court found that the improper contact had not caused McDonald to have a more positive view of other police detectives called by the State and attacked by the defense for conducting a sloppy investigation. The court concluded that

even if McDonald's assessment of Pikulski's credibility had been enhanced by their contact it did not logically follow that McDonald would have transferred his positive credibility assessment of Pikulski to the other police detective witnesses.[1]

On appeal, the appellant contends that the trial court committed legal error in denying his motion for new trial. He maintains that the improper contact between Pikulski and McDonald deprived him of his due process right to have his guilt or innocence "determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Allen v. State, supra,* 89 Md.App. at 42, 597 A.2d 489. He argues that prejudice was "inherent" in the improper contact and even though Pikulski and McDonald each testified to not having discussed the case, the substantial nature of their contact at the religious retreat gave rise to a "probability of prejudice" to McDonald's ability to fairly evaluate the case. The appellant asserts the improper contact heightened Pikulski's credibility in McDonald's eyes, caused him to have an "allegiance" to her, and had the "spillover effect" of also enhancing McDonald's credibility assessment of the entire police department. He maintains that under the circumstances, and given that one of his defense theories was that the police had been sloppy in their investigation, the trial court should have found that the State did not rebut the presumption of prejudice, as a matter of law.

The appellant further argues that Pikulski's inquiry to McDonald ("Oh you're one of the ones that convicted him?") could have led McDonald "to believe that Pikulski believed that the trial had finished and that she had expected [the appellant] to be convicted." He asserts that this remark could

---

1. The court also rejected two additional arguments advanced by the appellant: 1) that by denying him the right to attend the emergency hearing at which Pikulski and McDonald testified, the court denied him his right to be present at a "critical stage" of the proceedings so as to assist his counsel; and 2) that the holding in *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), somehow mandated that the court grant the appellant a new trial under the circumstances. The appellant has not raised these issues on appeal.

have improperly influenced McDonald to conclude that the appellant in fact was guilty of the crimes charged, thereby making McDonald a partial juror; and that for this reason, the trial court was required to grant a new trial.

Finally, the appellant maintains that the improper contact "cast[ ] the shadow of the appearance of impropriety onto the entire judicial system." He points to two articles in local newspapers published soon after he filed his motion for new trial documenting the encounter between McDonald and Pikulski, and argues that the articles evidence the public's displeasure at such an improper contact having occurred. He maintains that the potential for damage to the community's confidence in "the system" was such as to have required the granting of a new trial.

The State counters that even presuming prejudice from the improper contact between Pikulski and McDonald, the presumption was rebuttable and the trial court properly found that the State overcame the presumption by showing that the contact was "extremely limited and completely innocuous." It also maintains that even if Pikulski's credibility was enhanced in McDonald's eyes as a result of the improper contact, the trial court reasonably concluded that no prejudice had resulted to the appellant because, in advancing his defense theory, the appellant relied on Pikulski's testimony. In addition, the State asserts that the trial court properly found it was unlikely that the enhancement of Pikulski's credibility in McDonald's eyes created a "spillover effect" of enhancing his credibility assessment of the entire police department. As for the appellant's public perception argument, the State responds that the issue was not raised or decided below and lacks merit in any event.

 In their briefs, the parties maintain that under *Merritt v. State*, 367 Md. 17, 785 A.2d 756 (2001), the proper standard of review of this issue is "harmless error." In *Merritt*, the Court of Appeals explained:

> [W]hen an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does

not discover the alleged error during the trial, and when the issue is then raised by a motion for a new trial, [the denial of that motion is reviewed] under a standard of whether the denial was erroneous. . . . [W]here [the court] conclude[s] that error did occur, the matter of prejudice [is] received under the harmless standard of *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976)." [2]

*Id.* at 30–31, 785 A.2d 756.

In *Merritt*, the defendant was convicted by a jury of several offenses arising from a murder. Two days after the verdict, the parties discovered the court clerk had mistakenly marked several documents not admitted into evidence and sent them to the jury room during deliberations. On the basis of that error, the defendant filed a motion for new trial. The court denied the motion. The Court of Appeals reversed on appeal, holding that the presence of the unadmitted exhibits in the jury room likely caused prejudice to the defendant.

In advancing its argument on appeal, the State maintained that the trial court's decision to deny the motion for new trial was subject to reversal only for an abuse of discretion. The Court "flatly reject[ed]" that argument. In doing so, it discussed at length the evolution of the standard of review for a decision denying a motion for new trial. The Court noted that while such a decision ordinarily is reviewed for abuse of discretion, "there are situations in which there is virtually no discretion to deny a new trial." *Id.* at 29, 785 A.2d 756. Referring to its decision in *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 612 A.2d 1294 (1992), the Court explained that a trial judge has little or no discretion to deny a motion

---

**2.** The harmless error standard set forth in *Dorsey v. State* is:

When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

276 Md. at 659.

for new trial when, *inter alia,* "competent extrinsic evidence discloses that a jury's consideration of the case was seriously distorted by evidence that should not have been before the jury...." *Id.* at 30, 785 A.2d 756 (citing *Buck v. Cam's Broadloom Rugs, supra,* 328 Md. at 58–59, 612 A.2d 1294 (referring to *Wernsing v. General Motors Corp.,* 298 Md. 406, 420, 470 A.2d 802 (1984))).[3]

The Court went on to reason that when the losing party, through no fault of his own, does not discover an error until after trial, the proper standard for reviewing the denial of a motion for new trial based on that error is harmless error, not abuse of discretion. *Merritt v. State, supra,* 367 Md. at 30–31, 785 A.2d 756. The Court explained that the "substance and result of the clerk's action was essentially the same as the action of a trial judge in erroneously admitting an exhibit into evidence. The only real difference would be that, in the latter situation, defense counsel would have been aware of the action and would have had an opportunity to object." *Id.* at 32, 785 A.2d 756. It further reasoned that because the effect of the court clerk's action was the same as if the trial court had committed legal error in improperly admitting evidence during trial, a review of the denial of the motion for new trial properly would be conducted for legal error, not for an abuse of discretion.

The holding in *Merritt* does not mean that the standard of review of the trial court's decision to deny the appellant's motion for new trial in this case is "harmless error" instead of "abuse of discretion." To be sure, in both cases, the problem at issue was not discovered until after the verdict had been

---

**3.** In *Wernsing,* the Court of Appeals applied an abuse of discretion standard in reviewing the denial of a motion for new trial. In that case, a complex personal injury action, the defendant filed a motion for new trial after discovering that the jury had taken a dictionary into the jury room and had consulted it in the course of deliberating on the issue of proximate cause. The Court held that the denial of the motion for new trial was properly reviewed under an abuse of discretion standard, and that the "degree of probable prejudice [was] so great that it was an abuse of discretion to deny a new trial." *Wernsing v. General Motors Corp., supra,* 298 Md. at 420, 470 A.2d 802.

rendered, through no fault of either party. The similarities end there, however. In *Merritt,* as the Court explained, the error by the court clerk was the equivalent of the trial court's having committed legal error—not abusing its exercise of discretion—by admitting plainly inadmissible evidence. If the error had been known to the parties when it happened, and had generated an objection, a decision by the trial court to allow the material to go to the jury nevertheless would have been reviewed on appeal for error, not for abuse of discretion. The fact that that decision ultimately was made by the trial court in the context of a motion for new trial, because the problem was not discovered when it happened, did not convert the standard for reviewing the decision to "abuse of discretion."

In the case at bar, if the contact between Pikulski and McDonald had become known to the parties soon after it happened, while the trial was still in progress, the appellant could have moved the court to remove McDonald from the jury and replace him with an alternate juror,[4] or could have moved for a mistrial. Either decision—whether to remove McDonald or whether to grant a mistrial—would have been a discretionary call by the trial court based upon its assessment of whether the improper contact had had a prejudicial impact on the appellant's right to a fair trial. "The trial judge's discretion extends to matters concerning juror misconduct or other such irregularity in the conduct of others which may affect the jury." *Eades v. State,* 75 Md.App. 411, 420, 541 A.2d 1001 (1988) (citing *Walker v. Hall,* 34 Md.App. 571, 591, 369 A.2d 105 (1977)). "Because a trial judge is in the best position to evaluate whether or not a defendant's right to an impartial jury has been compromised, an appellate court will not disturb the trial court's decision on a motion for mistrial or a new trial absent a clear abuse of discretion." *Allen v. State, supra,* 89 Md.App. at 42–43, 597 A.2d 489. *See Wright v. State,* 312 Md. 648, 654, 541 A.2d 988 (1988); *Hunt v. State,*

---

4. If the State had consented, the appellant could have opted to proceed with only eleven jurors, under Md. Rule 4–311(b).

312 Md. 494, 500–01, 540 A.2d 1125 (1988); *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707 (1974).

A ruling during trial on whether to remove McDonald as a juror or to grant a mistrial due to the improper contact would have been an exercise in judicial discretion subject to review for abuse. A ruling on a motion for new trial under Rule 4–331(a) also is a matter of discretion subject to review for abuse. Accordingly, we shall review the trial court's ruling denying the motion for new trial filed by the appellant on the basis of the improper contact under the abuse of discretion standard, not under the "harmless error" standard.

 We now turn to the merits of the appellant's first issue. In a state court criminal proceeding, the Fourteenth Amendment guarantees the accused due process, including the right to be tried by a fair and impartial trier of fact. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Turner v. Louisiana*, 379 U.S. 466, 471–72, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Eades v. State, supra*, 75 Md.App. at 420, 541 A.2d 1001. To be fair and impartial, the trier of fact must base its decision in the case on the evidence admitted at trial. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Ware v. State*, 360 Md. 650, 669, 759 A.2d 764 (2000); *Calhoun v. State*, 297 Md. 563, 580, 468 A.2d 45 (1983).

 In a jury trial, when a private communication takes place between a third party and a juror, it raises a concern that the juror may reach a verdict not on the basis of the evidence, but on the basis of the communication. *Eades v. State, supra*, 75 Md.App. at 420, 541 A.2d 1001. *See also United States v. Day*, 830 F.2d 1099, 1103 (10th Cir.1987); *Owen v. Duckworth*, 727 F.2d 643, 646 (7th Cir.1984). Thus, "private communications between jurors and third persons are absolutely 'forbidden' and require the court to order a new trial 'unless their harmlessness is made to appear.' " *Eades v. State*, 75 Md.App. at 420–21, 541 A.2d 1001 (citing *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 36 L.Ed. 917 (1892)).

"[In] determining whether [an instance of improper] jury contact is prejudicial, a trial court must balance the 'probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case.' " *Allen v. State, supra,* 89 Md.App. at 46, 597 A.2d 489 (citing *Harford Sands, Inc. v. Groft,* 320 Md. 136, 138–39, 577 A.2d 7 (1990) (quoting *Wernsing v. General Motors Corp., supra,* 298 Md. at 411, 470 A.2d 802)). *See also Aron v. Brock,* 118 Md.App. 475, 525, 703 A.2d 208 (1997). "Where the record affirmatively shows prejudice by improper communications, the error requires reversal; but where the record affirmatively shows no prejudice, reversal is not required." *Allen v. State, supra,* 89 Md.App. at 46, 597 A.2d 489; *Aron v. Brock, supra,* 118 Md.App. at 525, 703 A.2d 208. *See Eades v. State, supra,* 75 Md.App. at 422–23, 541 A.2d 1001. On the other hand, when the record is silent with respect to whether the juror contact was prejudicial, "prejudice is presumed, and the burden falls on the state to rebut the presumption of harm." *Allen v. State, supra,* 89 Md.App. at 47, 597 A.2d 489 (footnote omitted). *See Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954) ("In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before a jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."). "The decision as to whether the State has met this burden is committed to the trial court's discretion, and ... will be reversed only upon a finding of abuse of that discretion." *Allen v. State, supra,* 89 Md.App. at 47, 597 A.2d 489.

The State argues that recent decisions of the Supreme Court and other federal courts establish that prejudice is no longer presumed in every instance of improper jury contact. Indeed, as this Court noted in *Eades v. State,* the Supreme Court's decision in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), "has cast some doubt on *Remmer's*

presumption of prejudice arising from any private communication with a juror about a matter pending before the jury." 75 Md.App. at 421, 541 A.2d 1001. In *Smith,* the Supreme Court refused to presume prejudice in a state court murder trial when during the trial a sitting juror applied for a job as an investigator in the prosecutor's office. The Court noted that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips, supra,* 455 U.S. at 217, 102 S.Ct. 940. Rather, "[d]ue process means . . . a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* The court held that a post-trial hearing conducted by the trial court, like the one ordered in *Remmer,* was "sufficient to decide allegations of juror partiality. . . ." *Id.* at 218, 102 S.Ct. 940.

Despite the holding in *Smith,* this Court in *Eades* "assume[d]" that the presumption of prejudice from contact with a juror during trial, under *Remmer,* remained the law. 75 Md.App. at 423, 541 A.2d 1001. Several years later, in *Allen,* we again favorably cited *Remmer* for the proposition that prejudice to the defendant is to be presumed when there has been an extrajudicial juror contact. *Allen v. State, supra,* 89 Md.App. at 47, 597 A.2d 489. In the case at bar, the State points out that since *Eades* and *Allen* were decided, the presumption has been further eroded by more recent federal decisions. *See United States v. Olano,* 507 U.S. 725, 739, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion [by a third party on the jury] affect the jury's deliberations and thereby its verdict?"); *United States v. Sylvester,* 143 F.3d 923, 934 (5th Cir.1998) ("the *Remmer* presumption of prejudice cannot survive *Phillips* and *Olano* . . . . [O]nly when the court determines that prejudice is *likely* should the government be required to prove its absence. This rule comports with our long-standing recognition of the trial court's considerable discretion in investigating and resolving charges of jury tampering") (emphasis added).

While these recent decisions make questionable the continuing vitality of the *Remmer* presumption of prejudice, we need not decide in the instant case whether presumed prejudice remains the proper standard in Maryland. Here, the trial court exercised its discretion to deny the new trial motion on a finding that the State had rebutted any presumed prejudice to the appellant from the improper contact.

The parties do not dispute that the contact between Pikulski and McDonald was improper. The contact was contrary to the trial court's instructions to the jurors forbidding them from interacting with third parties during the trial. McDonald's initial contact with Pikulski was inadvertent, but his subsequent contact with her, including having lunch and discussing their personal lives, was not. While the trial court credited McDonald's testimony that he and Pikulski did not discuss the case, the fact that they continued their contact beyond the brief communication in which they realized their predicament suggests the potential for prejudice. Indeed, the appellant cites several cases in which courts found contacts between jurors and witnesses prejudicial even in the absence of evidence that the contacts included discussions of the case. *See Turner v. Louisiana, supra,* 379 U.S. at 473, 85 S.Ct. 546 ("even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution."); *United States v. Marine,* 84 F.Supp. 785, 787 (D.Del.1949) (new trial warranted when juror and prosecution witness ate lunch together during the trial, even when it was uncertain that the two had discussed the case); *Miles v. State,* 261 Ala. 670, 675, 75 So.2d 479, 484 (Ala.1954) (defendant was entitled to a new trial "free from probability of injury" after three police officers who were witnesses for the prosecution accompanied the jury to and from lunch during the trial, even though there had been no discussion of the case); *Kelley v. State,* 555 N.E.2d 140, 142 (Ind.1990) (error in failing to grant motion for mistrial after it was discovered that a witness for

the prosecution had sat with three of the six jurors during a lunch recess); *Romo v. State,* 500 P.2d 678, 680 (Wyo.1972) (holding that the trial court should have granted the defendant's motion for mistrial after it was revealed that a police officer who also was a prosecution witness had sat with several jurors during a lunch break, even though the witness testified that he did not discuss the "business" of the case with the jurors).

As these cases recognize, however, when an improper contact has occurred, and when prejudice from the contact is presumed, the presumption is rebuttable. Indeed, in *Eades* and *Allen,* this Court concluded that "the inquiry of the trial court and the juror's response thereto effectively overcame the presumption operating in [the] appellant's favor." *Eades v. State, supra,* 75 Md.App. at 423–24, 541 A.2d 1001. *See Allen v. State, supra,* 89 Md.App. at 48, 597 A.2d 489.

In the case at bar, the trial court heard testimony from Pikulski and McDonald about their contact during the trial and on the basis of that evidence made factual findings and ultimately concluded that the State had shown by a preponderance of the evidence that the improper contact had not prejudiced the appellant's right to a fair trial by an impartial jury. In other words, the trial court found that assuming a presumption of prejudice from the improper contact, the State met its burden of rebutting the presumption by showing that the contact did not harm the appellant's due process rights. Our review of the record reveals that the trial court's factual findings concerning the issue of prejudice were supported by competent evidence and were not clearly erroneous; that its second-level factual finding that the appellant's due process rights were not harmed by the contact likewise was supported by the evidence and was based in reason; and that its decision to exercise discretion to deny the appellant's motion for new trial was sound and not abusive.

As we have noted, the trial court agreed with the appellant that the improper contact resulted in McDonald's having an "enhanced view of [Pikulski's] credibility." The trial court

concluded, however, that given the appellant's theories of defense, McDonald's positive view of Pikulski's credibility was not harmful to him; on the contrary, it was helpful. The trial judge observed: "Not only did the defense not contradict Detective Pikulski's testimony, to the contrary, they embraced it in an effort to discredit the testimony of one of the State's key witnesses."

The record supports this finding. As we noted above, the appellant's primary defense theory was misidentification. The State's star witness, Michael Clark, was an eyewitness to Dorsey's murder and identified the appellant as being present with Barnett at the scene. The defense sought to use Pikulski's testimony to discredit Clark by showing that the version of events he told her on the night of the shooting was at odds with several later versions he gave and with his trial testimony. In closing argument, in her effort to persuade the jury to reject Clark's testimony, defense counsel urged the jury to accept Pikulski's testimony as accurate and credible:

> Remember poor Detective Pikulski, who tried very very hard to get as much out of Michael Clark as she could and Michael Clark sat on this stand and he told you that he told Detective Pikulski that just after giving a forty-five minute interview with her, and a five page statement, that everything he had told her was wrong. That defies logic and common sense.
>
> *Detective Pikulski, I would suggest, is an experienced honest person and testified truthfully and that [she had] no motive, no motive whatsoever to be other than truthful to you.* Had Michael Clark told her that, she would have told you that.

(Emphasis added.)

In *Allen v. State, supra,* we explained that "a trial court may reasonably find that extrinsic evidence that actually assists a defendant's case is not prejudicial to him and, therefore, not sufficient evidence upon which to direct a mistrial." 89 Md.App. at 49, 597 A.2d 489. *See, e.g., Carpenter v. United States,* 475 A.2d 369, 376 (D.C.App.1984); *State v. Olin,* 103

Idaho 391, 399, 648 P.2d 203, 211 (1982); *State v. Bonaparte,* 222 Neb. 469, 472, 384 N.W.2d 304, 306 (1986). In *Allen,* brothers Peter and David Allen, along with another co-defendant, were tried on drug kingpin distribution and conspiracy charges. During jury deliberations, David Allen had breakfast with a dismissed alternate juror who then related to one of the sitting jurors that David had admitted selling drugs but had denied selling them for his brother and co-defendant, Peter. The judge conducted a *voir dire* of the juror who received the *ex parte* information. The defendants moved for a mistrial on the basis of the improper juror conduct. The trial court denied the motion and without informing the rest of the jury about the *ex parte* communications, instructed the jury to continue its deliberations. The jury returned with a verdict that day, finding Peter and David guilty on all counts, and their co-defendant not guilty on all counts.

On appeal, both brothers argued that the trial court had erred in denying their motion for a mistrial. We affirmed, holding, *inter alia,* that the contact could not have prejudiced Peter because the statement made to the sitting juror "exculpated rather than inculpated [him]." *Allen v. State, supra,* 89 Md.App. at 49, 597 A.2d 489.[5]

By the same token, in this case, McDonald's enhanced view of Pikulski's credibility likely would have *positively* influenced his view of the defense's theory of the case. Pikulski's testimony was that Clark give her a statement explaining, *inter alia,* that he and Dorsey had spent the afternoon of April 13, 2000, together, that before the shooting they were on the street but not walking together, and that when the two approached Dorsey, words were spoken, but Clark could not hear them. There was no indication from Pikulski that Clark told her or led her to think his statement was not an accurate version of the events. By contrast, Clark testified that he

---

5. We also found that under the "invited error doctrine," it was not improper for the trial court to deny David's motion for mistrial and, in any event, the jury contact did not prejudice him. *Allen v. State, supra,* 89 Md.App. at 46–47, 597 A.2d 489.

gave Pikulski a version of events that was inaccurate, because he was scared and was high on drugs, and that after reciting the events, he told Pikulski his statement was inaccurate.

The defense urged the jurors to believe Pikulski because believing her would lead them to conclude that Clark simply made up different versions of the events of the night of the shooting, depending upon what was expedient and helpful to him, and that therefore nothing he said, including his in-court testimony, could be believed. Thus, it was reasonable for the trial court to conclude that, to the extent the jurors found Pikulski credible, it was more likely they would find the State's star witness *not* credible, and hence more likely that they would find the appellant not guilty.

As we have explained, the trial court also rejected the appellant's argument that McDonald's positive credibility assessment of Pikulski based on their improper contact had prejudiced him by in turn enhancing his view of the entire police department. The court reasoned that the mere fact that McDonald may have been more inclined to believe Pikulski after spending time with her at the religious retreat did not reasonably support a finding that he would favor the police force's version of how their investigation was conducted over the appellant's. As the court pointed out, there was nothing about the nature of the contact between Pikulski and McDonald that would have led McDonald to view Pikulski as a representative of the entire police force or to generalize his view of her character to the police force as a whole. This reasoning is sound and supported by logic.

In addition, the appellant's argument is belied by the strategy he followed at trial. As noted above, the *defense* urged the jurors to believe Pikulski's testimony, apparently without any concern that their doing so would have the "spillover" effect of making the police force's version of the investigation more believable than the appellant's version. The defense would not have adopted a strategy to tout Pikulski's credibility to the jury if the strategy was likely to harm its "sloppy police investigation" defense theory.

The trial court found no merit in the appellant's argument that Pikulski's remark to McDonald that "you're one of the ones that convicted him" could have influenced him to think he (the appellant) was guilty of the crimes charged. McDonald's testimony, credited by the court, was that when he approached Pikulski at the retreat and mentioned being a juror she did not seem to know, and he did not believe she knew, what case he was serving in. That being the case, there would be no reason for McDonald to have thought Pikulski's comment meant she thought, as the appellant puts it, that the appellant's "trial had finished and that she had expected [him] to be convicted."

In this Court, the appellant asserts that the contact between Pikulski and McDonald was such that they formed a "spiritual/religious bond" that caused McDonald to feel, consciously or subconsciously, a "sense of loyalty" to Pikulski's "side" of the case and that could have made him "fe[el] uncomfortable voting any way but 'guilty.' "

We note that the appellant did not present this argument in his motion for new trial or during the June 20, 2001 hearing on the motion. To the extent it was implicit in his more general argument about enhanced credibility, it also was implicitly rejected by the trial court.

Again, the defense theory of the case was based in part on Pikulski's testimony; therefore, although Pikulski was called to testify by the State, she was not a witness tied strongly to one "side" of the case. Moreover, the trial court found from competent and material evidence that Pikulski did not communicate to McDonald a belief that the appellant was guilty or an endorsement of the State's case.

Finally, we agree with the State that the appellant did not preserve the argument that the trial court should have granted him a new trial to protect a positive public image for the criminal justice system. In his "Supplemental Memorandum and Request to Strike Testimony," filed in the trial court on May 10, 2001, the appellant cited two newspaper articles about the case. Then, at the June 20, 2001 hearing on the motion

for new trial, the appellant suggested in argument to the court that McDonald may have read the articles and, realizing that "there was essentially an uproar over that type of contact during the course of trial between an agent of the State and a juror," may have "attempt[ed] to minimize or disregard the comments by the detective." At no point below did the appellant argue that public controversy or the public's reaction over the contact between Pikulski and McDonald warranted granting a new trial. "Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8–131(a); *see Walker v. State,* 338 Md. 253, 262, 658 A.2d 239 (1995).

Even if this issue had been raised below, the appellant would fare no better. To be sure, in a general sense, how the public perceives the criminal justice system affects whether defendants receive fair and impartial trials. *See Young v. United States,* 481 U.S. 787, 811–12, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (conduct of prosecutor); *Jackson v. State,* 364 Md. 192, 207, 772 A.2d 273 (2001) (sentencing). We are dealing in this appeal with a particular defendant and a particular trial, however, and the specific question whether an instance of improper contact between a witness for the State and a juror, during the trial, was prejudicial.

Again, even assuming prejudice from the improper contact, it was well within the discretion of the trial court to determine whether that prejudice was outweighed by countervailing evidence of lack of prejudice. After hearing testimony from Pikulski and McDonald and considering the arguments presented by the parties, the trial court concluded that it was satisfied that the improper contact did not prejudice the appellant in his defense. We agree with the State that the factual findings on which this decision was based were not clearly erroneous and were supported by competent and material evidence. Accordingly, the trial court did not abuse its discretion in denying the appellant's motion for new trial.

## II.

Alfred Smith was called to testify by the State. The following took place before he took the stand:

[DEFENSE COUNSEL]: Your Honor, [the appellant] has a fundamental right to confront the witnesses that the [S]tate intends to use against him in this criminal trial. It is apparent that the [S]tate intends to use Mr. Barnett against [the appellant] and it is apparent that the [S]tate is attempting to establish that Mr. Barnett's purported attempt to purchase a handgun somehow implicates [the appellant] in the murder of Steven Dorsey. That much we know.

\* \* \* \*

We cannot confront Mr. Barnett. It is essential for us to be able to do that because, as I proffered to the Court earlier, we have reason to believe, either, one, that this attempted purchase never occurred, or, two, if there was an attempt it was under circumstances that Barnett was not motivated to then murder Dorsey.

Not being able to cross-examine Barnett where the [S]tate is attempting to use that irreparably prejudices the trial in such a way that any attempt to cure it through limited [sic] instruction to the jury is unrealistic.

\* \* \* \*

THE COURT: Let me see if I precisely understand the piece of evidence we are talking about because you say it is being offered by way of motive.

As I understand what the [S]tate seeks to introduce through this witness, Mr. Smith, is that the alleged co-defendant [Barnett] approached Mr. Smith three days before the shooting and asked to buy or offered to purchase a handgun or was looking to buy a handgun, correct?

[THE STATE]: From the victim.

THE COURT: From the victim and that is overheard by Mr. Smith.

[THE STATE]: Absolutely.

THE COURT: And on the night in question, according to Mr. Clark, the victim makes a reference to I have that thing you are looking for.

[THE STATE]: Correct.

THE COURT: Now aside from those two statements, when you say motive do you intend to try and show evidence that in the interim he had made statements that he was mad that the victim hadn't gotten the gun yet, or is it simply trying to tie the statement of the night in question into the other statement?

[THE STATE]: It is to tie the statement of the night in question to the earlier statement.

Your Honor, also to establish sort of a causation. It is not clear—it is not a hearsay statement. We are not offering it for the truth of the matter.

For all we know, it was very much in furtherance of the conspiracy in the sense that the gun deal was just a ruse to establish a contact with Mr. Dorsey.

Mr. Dorsey had no clue that his life was in jeopardy at the time that he encountered these two individuals. Consistent with that, Your Honor, the [S]tate's position is that the whole gun deal could have been simply a ruse to establish a contact between them.

It is our understanding that prior to that there had been no contact. That was the only basis for the contact between Mr. Dorsey and Mr. Barnett prior to that. They didn't know each other.

THE COURT: [Defense counsel], it seems to me that I return to what is important here is whether or not the statement that was made three days earlier by Mr. Barnett to Mr. Dorsey that he wanted to purchase this gun which in turn explains the statement that Mr. Dorsey made the night in question that he had that thing that you are looking for, without regard to whether the statement made three days earlier was true at the time that Mr. Barnett made it,

maybe it was just a ruse to establish some contact and maybe he didn't really want the gun.

Whether he wanted the gun or not is not what is relevant or important here. It is the fact that he had approached Dorsey about wanting a gun and then three days later Dorsey makes reference to that earlier conversation. . . .

Your right to confrontation is [p]reserved to the extent that at least you are able to examine the witness on the stand about whether or not the statement was made. That preserves the right to confrontation and it is not hearsay for the purpose [f]or which it is offered so I don't really have to reach or decide [if] that was in the furtherance of conspiracy although based upon the facts I have heard you could I think arguably make an argument that it is.

As I hear the proffer, it appears to me it is not hearsay in the first instance so I overrule the objection and the objection is noted and preserved for the record. You have all your arguments preserved to you.

\* \* \* \*

[DEFENSE COUNSEL]: I[am] not making any further argument. I am asking for a curative instruction to the extent that it is being offered not for its truth. I think we are entitled to that curative instruction.

THE COURT: Any objection?

[THE STATE]: No.

THE COURT: Okay, I will do it.

The State proceeded with its direct examination of Smith. The following transpired:

[THE STATE]: When if ever did you see [Barnett] with Steven Dorsey?

\* \* \* \* \* \*

[SMITH]: I seen him like three days before.

[THE STATE]: With Steven Dorsey?

[SMITH]: He wasn't with him but he came to talk to him.

[THE STATE]: Were they occupying the same space and close enough to talk to each other?

[SMITH]: Yes.

[THE STATE]: Do you know what they were talking about?

[SMITH]: Yes.

[THE STATE]: What if anything did Mr. Barnett inquire concerning Mr. Dorsey?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[SMITH]: He was trying to buy a gun.

THE COURT: Ladies and gentlemen, let me tell you with respect to that particular statement, I am admitting it for the purpose of—I am letting the witness testify that the individual made that statement without regard to whether it was true or not—without regard, in other words, to whether he really wanted a gun or not but that he made the statement that he was looking for a gun.

It is offered to show that the statement was made without regard to whether it was a true statement at the time it was made.

The appellant contends that the trial court erred in permitting Smith to testify that three days before the shooting Barnett approached Dorsey and made an inquiry about purchasing a gun from him.

Although the appellant complains that the trial court's ruling that Barnett's inquiry was not hearsay because it was not offered to prove the truth of the matter asserted was in error, he does not argue the point. Rather, he argues that Smith's testimony about Barnett's inquiry was irrelevant, and that any relevance it did have was outweighed by its prejudicial effect; therefore, it should have been excluded. Specifically, he maintains that because there was no evidence that he was present during the exchange between Dorsey and Barnett three days before the shooting, or that he had any knowledge of it, the exchange was irrelevant because it did not tend to show that

he (the appellant) was present with Barnett at the time of the shooting. He further argues that to the extent the exchange established a motive for Barnett to kill Dorsey, it was prejudicial because its effect "was . . . to carry over to [the appellant] as an implicit guilt by association." Finally, the appellant argues that the court's instruction was insufficient to cure the "manifest" prejudice the evidence caused.

The State counters that the appellant waived this issue for appeal because he did not argue with specificity the grounds for his objection at trial; and, even assuming the issue was preserved for review, the trial court properly admitted as relevant non-hearsay Smith's testimony about the words he heard Barnett say to Dorsey three days before the shooting. The State maintains that Smith's testimony was offered not to show the truth of Barnett's words (that he wanted to buy a gun from Dorsey), but to show that Barnett and Dorsey had had some contact prior to the shooting and to explain what Dorsey might have meant when, right before the shooting, he said to Barnett, "I still got that for you." The State argues that the evidence was relevant to its theory that the appellant had aided and abetted Barnett in the commission of the crimes against Dorsey, and that, rather than "constituting an unfair spillover effect to [the appellant], the evidence was equally probative as to him," and was not unduly prejudicial.[6] Therefore, the trial court properly exercised its discretion to admit the evidence.

We reject the State's lack of preservation argument. "It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal." *Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999). Admittedly, the appellant's argument in response to the State's proffer focused on his right of confron-

---

6. In addition, the State argued at trial that the statements were relevant to the conspiracy charge against the appellant, for which he was later found not guilty.

tation.[7] The argument he makes on appeal, that the evidence was irrelevant, was part of his confrontation argument, however. The appellant told the trial court he was objecting to the use of the evidence to implicate him because "we have reason to believe, either, one, that this attempted purchase never occurred or, two, if there was an attempt it was under circumstances that Barnett was not motivated to then murder Dorsey." At the heart of the appellant's argument about needing to confront Barnett was the notion that if he could question Barnett, he could show that he (the appellant) was not involved in the murder and that any evidence about Barnett's motivations was irrelevant to the issue of the appellant's participation in the crimes.

We reject the appellant's argument on its merits, however. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence." Md. Rule 5–401 (emphasis added). *See Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976) ("The real test of admissibility of evidence in a criminal case is 'the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue.'") (citing *MacEwen v. State,* 194 Md. 492, 501, 71 A.2d 464 (1950)). Rulings on the admissibility of evidence, including relevancy determinations, are within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991). Ordinarily, relevant evidence is admissible. Md. Rule 5–402. It is within the discretion of the trial court to decide whether relevant evidence should not be admitted because "its probative value is substantially outweighed by the danger of unfair prejudice...." Md. Rule 5–403. *See also Sowell v. State,* 122

---

7. The appellant also argued that the statements were hearsay that were not admissible under Md. Rule 5–803(a)(5), which does not exclude as hearsay statements by a party's co-conspirator during and in furtherance of a conspiracy. The trial court declined to reach this issue.

Md.App. 222, 228, 712 A.2d 96 (1998), *aff'd on other grounds,*
353 Md. 713, 728 A.2d 712 (1999).

The trial court properly determined that Barnett's inquiry
to Dorsey, spoken in Smith's presence three days before the
shooting, was not hearsay, because it was not offered to prove
the truth of the matter asserted, that is, that Barnett in fact
wanted to purchase a gun from Dorsey. Rather, the words
were offered to show a connection between Barnett and
Dorsey—that they had had a conversation three days before
the shooting and that from what Barnett said, Dorsey would
have thought Barnett wanted to buy a gun from him. The
words tended to prove the existence of a connection between
Barnett and Dorsey, and to explain why, in response to
Barnett's comment just before the shooting, "Just the nigger
I'm looking for," Dorsey said, "I still got that for you."

The evidence was relevant to show it was more probable
than not that Barnett and Dorsey had had contact before the
shooting and Dorsey would have thought Barnett was looking
for him. A pre-existing connection between Barnett and
Dorsey was of consequence in the case against the appellant
regardless of whether there also was evidence that the appel-
lant knew about it. There was evidence connecting the appel-
lant to Barnett and, as we shall explain, tending to show that
the appellant was present and aiding and abetting Barnett in
the commission of the shooting. Accordingly, evidence tend-
ing to explain Barnett's presence at the scene and his prior
relationship to Dorsey also was relevant to whether the appel-
lant simply was present at the scene or was participating as an
aider or abettor.

Moreover, as stated above, it was within the trial court's
discretion to determine whether the probative value of the
evidence would be substantially outweighed by the danger of
unfair prejudice to the appellant. In ruling the evidence
admissible, the trial court noted that the appellant would be
permitted to examine Smith about whether the statement in
fact was made; and at the defense's request, the trial court

gave a curative instruction limiting the use of the evidence.[8] The trial court did not abuse its discretion in ruling, implicitly, that the probative value of the evidence of Barnett's statement was not substantially outweighed by the danger of unfair prejudicial effect.

## III.

The appellant next contends that the motion court erred in denying his motion to suppress Clark's extrajudicial and in-court identifications of him. According to the appellant, the procedure used by the police in procuring the extrajudicial identification was impermissibly suggestive, in part because he was the only person who appeared in both a photographic array and lineup presented to Clark. Moreover, he argues that the State failed to overcome the presumption in favor of excluding overly suggestive identification evidence by demonstrating that the identification was reliable. The appellant maintains that the in-court identification was tainted by the extrajudicial identification.

The State responds that the extrajudicial identification procedure used by the police was not impermissibly suggestive and, even if it was, Clark's identification was sufficiently reliable to warrant the denial of the appellant's motion to suppress.

"Due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *McDuffie v. State,* 115 Md.App. 359, 366, 693 A.2d 360 (1997) (citing *Moore v. Illinois,* 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977)). Maryland case law establishes a two-prong test for resolving challenges to extrajudicial identifications. *McDuffie v. State, supra,* 115 Md.App. at 366, 693 A.2d 360. First, the defense bears the initial burden of showing that the "the identification procedures was impermissibly suggestive." *Id. See Jones v. State,* 310 Md. 569, 577,

---

**8.** The appellant did not object to the contents of the curative instruction or ask the court to expound further. Accordingly, the appellant did not preserve his argument that the curative instruction "had little success in remedying the error."

530 A.2d 743, *vacated and remanded on other grounds,* 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988); *Brockington v. State,* 85 Md.App. 165, 172, 582 A.2d 568 (1990).

"If the out-of-court identification was not made under suggestive circumstances, the due process inquiry ends: both judicial and extrajudicial identification evidence is admissible." *Jones v. State, supra,* 310 Md. at 577, 530 A.2d 743 (citing *Webster v. State,* 299 Md. 581, 620, 474 A.2d 1305 (1984) (determination that lineup was in no way suggestive is dispositive of due process claim)).

If the defendant demonstrates that the identification was "tainted by suggestiveness," *Jones v. State, supra,* 310 Md. at 577, 530 A.2d 743, the State then bears the burden of proving "by clear and convincing evidence, the existence of reliability in the identification that outweighs the corrupting effect of the suggestive procedure." *Thomas v. State,* 139 Md.App. 188, 208, 775 A.2d 406 (2001), *aff'd on other grounds,* 369 Md. 202, 798 A.2d 566 (2002). The following factors are relevant to whether, under the totality of the circumstances, the identification was reliable:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). *See Jones v. State, supra,* 310 Md. at 578, 530 A.2d 743; *Webster v. State, supra,* 299 Md. at 607, 474 A.2d 1305; *Thomas v. State, supra,* 139 Md.App. at 210, 775 A.2d 406; *Loud v. State,* 63 Md.App. 702, 706, 493 A.2d 1092 (1985).

An inquiry into reliability "is the linchpin in determining the admissibility of identification testimony. . . ." *Hopkins v. Maryland,* 352 Md. 146, 161, 721 A.2d 231 (1998) (citing *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977)). However,

not all impermissibly suggestive procedures call for exclusion, but only those impermissibly suggestive procedures that would *actually give rise to a very substantial likelihood of irreparable misidentification.* Until a defendant establishes impermissive suggestiveness in the first instance as a basis for presumptive exclusion, therefore, *a court does not even inquire,* by looking at the suggested reliability factors, into whether the State is entitled to an exemption from that presumptive exclusion. The reliability inquiry, in short, is not an additional ground for exclusion but is, rather, a limitation on exclusion.

*Conyers v. State,* 115 Md.App. 114, 120, 691 A.2d 802, *cert. denied and appeal dismissed,* 346 Md. 371, 697 A.2d 111 (1997) (emphasis added). Indeed, the scope of identification procedures constituting "impermissible suggestiveness" is extremely narrow:

To do something impermissibly suggestive is not to pressure or browbeat a witness to make an identification but only to feed the witness clues as to which identification to make. THE SIN IS TO CONTAMINATE THE TEST BY SLIPPING THE ANSWER TO THE TESTEE. All other improprieties are beside the point.

*Id.* at 121, 691 A.2d 802 (emphasis in original).

In addition, as with all determinations of credibility, the reviewing court "extend[s] great deference to the fact finding of the suppression hearing judge with respect to determining the credibilities of contradicting witnesses and to weighing and determining first-level facts." *McDuffie v. State, supra,* 115 Md.App. at 366, 693 A.2d 360 (citing *Perkins v. State,* 83 Md.App. 341, 346, 574 A.2d 356 (1990)).

On January 4, 5, and 8, 2001, the motion court held a hearing on all pending motions, including the appellant's motion to suppress identification evidence. The motion court denied the appellant's motion upon a finding that the procedure employed by the police in obtaining the identification was not impermissibly suggestive.

The facts pertaining to the identification, as adduced at the motion hearing, were essentially undisputed, and showed the following. On April 25, 2000, Detective Paula Hamill showed Clark a photo array containing a picture of the appellant taken in June of 1994. Clark was unable to make an identification from the photo array. He testified at the motion hearing that he had been uncertain about whether the appellant's picture was among the photos he viewed. With respect to photo number 3, which was that of the appellant, Clark testified that he had thought that picture "could be one of the people, but I didn't want to say yeah, that's him for 100 percent and I didn't—and I wasn't 100 percent."

Three months later, on July 13, 2000, Clark was shown a videotaped lineup of several suspects, including the appellant. The appellant was the only person whose picture appeared in the photo array shown to Clark on April 25, 2000, and who also participated in the lineup. At the request of defense counsel, several adjustments were made to the lineup before it was shown to Clark: all of the participants were made to wear baseball caps to conceal their hair, were not permitted to wear white t-shirts, and were videotaped so their shoes were not visible. Clark identified the appellant from the lineup. At the motion hearing, Clark testified that he made his lineup selection based on his observations at the time of the shooting and not based on anything communicated to him by the police officers.

In its written opinion and order, the motion court found these factors significant in denying the appellant's motion to suppress:

> The Court notes that the photographs of the Defendants [referring to Barnett and the appellant] used in the arrays were several years old. There is nothing suggestive in the way the arrays were displayed to Michael Clark by police officers. It is also significant that Clark failed to identify either Defendant from the arrays. A time lapse of several months occurred between Clark's viewing of the photo arrays and the line-ups. The Court does not find that the display of the photographs tainted the line-up proceedings.

The videotapes [of the line-ups] and still photographs in evidence allow the Court to evaluate the composition of the line-ups and the identification procedure conducted by the State.

With regard to Defendant Jenkins, it is hard to envision how the State could improve upon the composition of the line-up. There is nothing in the record to support a conclusion that the line-up was unnecessarily suggestive. All participants are similar in appearance, similarly dressed and wearing identical caps to eliminate the possibility that hairstyle would be used as the sole identifying characteristic.

On appeal, the appellant argues that the fact that he was the only suspect to appear in both the photo array and the lineup "[w]hile not dispositive ... is a factor in determining suggestiveness." *See United States v. Briley*, 726 F.2d 1301, 1306–07 (8th Cir.1984) (the fact that the appellant was the only person to appear in both the photo spread and the line-up did not make the identification procedure *per se* suggestive. "This is but one factor to consider.").

While we agree that it was a factor, we also agree with the motion court that under the totality of the circumstances, the identification procedure in this case was not impermissibly suggestive. As the motion court explained, there was nothing about the videotaped line-up that pointed to the appellant—the participants were made to look as similar to each other in appearance as possible. The only potentially suggestive feature—that the appellant's likeness/presence was included in both the photo array and the line-up, without any of the other participants likewise overlapping—would only be suggestive if there were some reason for Clark to notice it. There was no evidence that he did notice it, and the passage of several months between the presentation of the photo array and the line-up was such as to have made it highly unlikely that he would have noticed it. Accordingly, the motion court did not err in ruling that the appellant did not sustain his burden of showing, by a preponderance of the evidence, that the identification procedure used by the police was unduly suggestive,

and on that basis denying the appellant's motion to suppress Clark's extrajudicial and in-court identifications.

## IV.

The appellant contends that the sentencing court erred by not merging his conviction for first degree assault on Clark into his conviction for attempted first degree murder of Clark. He rests his argument on two Court of Appeals decisions: *Dixon v. State,* 364 Md. 209, 772 A.2d 283 (2001), and *Williams v. State,* 323 Md. 312, 593 A.2d 671 (1991).

The State responds that the court properly imposed separate sentences for the two convictions because for purposes of merger the type of first degree assault the appellant was convicted of is not the same offense as attempted first degree murder.

The doctrine of merger arises in part from the Fifth Amendment double jeopardy clause, which "prohibits both successive prosecutions for the same offense as well as multiple punishment for the offense." *Dixon v. State, supra,* 364 Md. at 236, 772 A.2d 283 (footnote omitted) (citing *Newton v. State,* 280 Md. 260, 262–63, 373 A.2d 262 (1977)). The protections embodied in the Fifth Amendment apply to the states through the Fourteenth Amendment. *Dixon v. State, supra,* 364 Md. at 236, 772 A.2d 283; *Nightingale v. State,* 312 Md. 699, 702, 542 A.2d 373 (1988), *superseded by statute as stated in Fisher v. State,* 367 Md. 218, 242, 786 A.2d 706 (2001). Likewise, under Maryland common law, "a defendant cannot be put in jeopardy again for the same offense—in jeopardy of being convicted of a crime for which he had been acquitted; in jeopardy of being twice convicted and punished for the same crime." *Dixon v. State, supra,* 364 Md. at 236 n. 26, 772 A.2d 283 (citing *State v. Griffiths,* 338 Md. 485, 489, 659 A.2d 876 (1995)) (internal quotations omitted).

We apply the "required evidence test" to determine whether two offenses merge for purposes of double jeopardy. *Dixon v. State, supra,* 364 Md. at 236, 772 A.2d 283; *Nightin-*

*gale v. State, supra,* 312 Md. at 703, 542 A.2d 373. In *Nightingale,* the Court explained that test as follows:

If each offense requires proof of a fact which the other does not, the offenses are not the same and do not merge. However, if only *one* offense requires proof of a fact which the other does not, the offenses are deemed the same, and separate sentences for each offense are prohibited.

*Nightingale v. State, supra,* 312 Md. at 703, 542 A.2d 373 (emphasis added) (quoting *Newton v. State, supra,* 280 Md. 260, 268, 373 A.2d 262 (1977)).[9] The required evidence test applies equally to common law and statutory offenses. *Dixon v. State, supra,* 364 Md. at 237, 772 A.2d 283; *Williams v. State, supra,* 323 Md. at 317, 593 A.2d 671.

In Maryland, murder is a common law crime that by statute is divided into two degrees. *Mitchell v. State,* 363 Md. 130, 146, 767 A.2d 844 (2001); *Gladden v. State,* 273 Md. 383, 402, 330 A.2d 176 (1974). First degree murder is "[a]ll murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate, and premeditated killing." Md.Code (1957, 1996 Repl.Vol., 2000 Supp.), art. 27, section 407. As the Court of Appeals has explained:

The principles of law applicable to determining whether a felonious homicide constitutes a wilful, deliberate and premeditated murder are well settled. For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall

---

9. The "required evidence test" is derived from the Supreme Court's decision in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

have existed for any particular length of time. Their existence is discerned from the facts of the case.

*Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830 (1980).

The crime of attempt, which remains a common law offense, is "the intent to commit a crime coupled with some overt act beyond mere preparation in furtherance of the crime." *Hardy v. State,* 301 Md. 124, 138–39, 482 A.2d 474 (1984). *See Lightfoot v. State,* 278 Md. 231, 237, 360 A.2d 426 (1976). The crime of attempt "is an adjunct crime . . . applicable to any existing crime, statutory or common law." *Hardy v. State, supra,* 301 Md. at 139, 482 A.2d 474.

Thus, to be convicted of the crime of attempted first degree murder, an accused must be found to have attempted to commit first degree murder with the requisite intent required for conviction of first degree murder. "If the evidence satisfied the fact finder by proof beyond a reasonable doubt that the conduct of the defendant falls within the proscribed conduct in the statute labeled as first degree murder that did *not* result in death of the victim, then the crime of attempted murder in the first degree has been established." *Hardy v. State, supra,* 301 Md. at 139–140, 482 A.2d 474 (emphasis added).

First degree assault is made punishable by Md.Code (1957, 1996 Repl.Vol., 2000 Supp.) article 27, section 12A–1. This section provides two modalities of first degree assault:

(a) *Serious physical injury; use of a firearm*—(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm, . . .

In *Dixon v. State,* the Court of Appeals held that under the "required evidence test," first degree assault of the (a)(1) modality merges into attempted voluntary manslaughter. The Court reasoned that the intent to kill required for a conviction for attempted voluntary manslaughter

envelops the intent to do serious physical injury. Therefore, there is nothing required by modality (a)(1) of the first

degree assault statute that is not *also* required by attempted voluntary manslaughter; the evidence required to show an attempt to kill would demonstrate causing, or attempting to cause, a serious physical injury.

364 Md. at 240, 772 A.2d 283 (emphasis added). The Court further held that first degree assault of the (a)(2) modality does not merge with attempted voluntary manslaughter, however, because use of a firearm is an element of that offense not required for attempted voluntary manslaughter, as manslaughter " 'may be attempted by modalities or with instrumentalities other than a firearm . . . .' " *Dixon v. State, supra,* 364 Md. at 241, 772 A.2d 283 (quoting *Dixon v. State,* 133 Md.App. 325, 345, 755 A.2d 560 (2000)). Accordingly, first degree assault of the (a)(1) modality is a lesser included offense of attempted voluntary manslaughter while first degree assault of the (a)(2) modality is not. Because the Court in *Dixon* could not determine which of the first degree assault modalities the defendant had been convicted of, it resolved the ambiguity in his favor and merged the convictions.

In this case, the record makes plain that the jury found the appellant guilty under the (a)(2) modality of first degree assault. The trial court instructed the jury as follows:

An assault in the first degree is actually a higher form of assault in the second degree so let me first explain to you what assault in the second degree is. Assault in the second degree is an attempt to cause physical harm. In order to convict the defendant of assault, and this is assault in the second degree, the State must prove that the defendant actually tried to cause immediate physical harm to Michael Clark, that the defendant intended to bring about physical harm and that the defendant's actions were not consented to by Michael Clark.

Now in order to find assault in the first degree, the State would have to prove all of the elements of assault in the second degree *and must also prove that the defendant used a firearm to commit assault in the second degree.*

(Emphasis added.) Accordingly, the jury must have found that the appellant used a firearm in the commission of the assault against Clark.

Use of a firearm, a required element of first degree assault of the (a)(2) modality, is not a required element of attempted first degree murder. Likewise, because attempted first degree murder contains the elements of premeditation and deliberation, *see Williams v. State, supra,* 323 Md. at 320, 593 A.2d 671, that offense has required elements not found in first degree assault of either modality. Thus, under the required evidence test, the appellant's conviction for first degree assault does not merge with his conviction for attempted first degree murder.

The required evidence test is not the exclusive standard in Maryland for determining whether two offenses based on the same act or acts should merge. *See Williams v. State, supra,* 323 Md. at 320, 593 A.2d 671; *White v. State,* 318 Md. 740, 744, 569 A.2d 1271 (1990), superseded by statute as stated in *Fisher v. State,* 367 Md. 218, 242, 786 A.2d 706 (2001). When a strict application of the required evidence test does not result in the merger of two offenses, courts in Maryland "have applied as a principle of statutory construction the rule of lenity, which provides that doubt or ambiguity as to whether the legislature intended that there be multiple punishments for the same act or transaction will be resolved against turning a single transaction into multiple offenses." *Williams v. State, supra,* 323 Md. at 321, 593 A.2d 671 (quoting *White v. State, supra,* 318 Md. at 744, 569 A.2d 1271 (internal quotation marks omitted)(quoting *Simpson v. United States,* 435 U.S. 6, 15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978))). The rule of lenity is intended to prevent courts from "interpreting a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended." *Holbrook v. State,* 364 Md. 354, 373, 772 A.2d 1240 (2001) (alterations in original) (quoting *Monoker v. State,* 321 Md. 214, 222, 582 A.2d 525 (1990)).

As with the required evidence test, the rule of lenity is applicable when both crimes are statutory, or when one offense is statutory and the other is a common law crime. *Holbrook v. State, supra,* 364 Md. at 373, 772 A.2d 1240; *Monoker v. State, supra,* 321 Md. at 223, 582 A.2d 525. Unlike the required evidence test, in which the lesser included offense merges into the greater offense, under the rule of lenity "there is a merger of penalties, not offenses, and the lesser penalty generally merges into the greater penalty." *Dixon v. State, supra,* 364 Md. at 250, 772 A.2d 283 (internal quotations omitted) (citing *Spitzinger v. State,* 340 Md. 114, 125, 665 A.2d 685 (1995)).

In *Williams v. State, supra,* the Court held that under the rule of lenity, the defendant's two convictions for attempted first degree murder merged with his two convictions for assault with intent to murder. The defendant's convictions arose out of the same acts: his drenching two victims with gasoline and setting them on fire. The Court reasoned that under the required evidence test, the offenses did not merge because attempted first degree murder required proof of premeditation and deliberation, which assault with intent to murder did not, and assault with intent to murder required proof of an assault, which attempted first degree murder did not. *Williams v. State, supra,* 323 Md. at 319–20, 593 A.2d 671. The Court concluded, however, that merger was required under the rule of lenity because the convictions arose out of the same acts and there was no suggestion "in either statutory provisions or legislative history or the Court's opinions, that one of the purposes in establishing the offense of assault with intent to murder was to compound the punishment for attempted murder." *Id.* at 322–23, 593 A.2d 671.

In this case, like in *Williams,* the appellant's attempted first degree murder conviction and first degree assault conviction arose out of the same acts: his firing a handgun at Clark as Clark retreated from the scene. While we disagree, as we have explained, with the appellant's assertion that the offenses merge under the "required evidence test," we conclude that

the sentences should have been merged under the rule of lenity.

First degree assault of the (a)(2) modality is an attempt to cause, or actually causing, physical harm to another by use of a firearm. *See Lamb v. State,* 93 Md.App. 422, 428–29, 613 A.2d 402 (1992) (holding that under Maryland common law, an "assault" is an attempted battery, an actual battery, or a combination of the two). Like first degree assault of the (a)(1) modality, it is an aggravated form of second degree, *i.e.,* common law, assault. The aggravating factor in the (a)(1) modality is the intent to cause (or attempt to cause) *serious* physical injury; the aggravating factor in the (a)(2) modality is the use of a firearm—from which an intent to cause serious physical injury can be inferred.

Here, the appellant was convicted of first degree assault for intentionally attempting to cause physical harm to Clark with a firearm. Attempted first degree murder, as we have explained, is an attempt to commit a willful, deliberate, and premeditated killing. The appellant was convicted of attempted first degree murder for attempting to willfully, deliberately, and premeditatedly kill Clark with a firearm, by means of the identical conduct constituting the first degree assault. Thus, on the facts in evidence and the instructions given by the trial court, the jury must have found that in firing at Clark the appellant was attempting to kill him (willfully, deliberately, and with premeditation) and was attempting to cause him physical harm with a firearm. It cuts too fine to say that, on the same set of facts, in a single transaction, the General Assembly intended separate punishments. Accordingly, under the rule of lenity, the appellant's sentence for first degree assault should have merged with his sentence for attempted first degree murder.

## V.

Finally, the appellant contends that the evidence was insufficient to support his convictions. He argues that "the record is simply devoid of reliable evidence to establish

that [the appellant] was present at the time of the offense." According to the appellant, not only was Clark's identification of him rendered "questionable" by Clark's admitted drug use the day of the shooting and his later inability to pick the appellant's photograph out of an array but also the defense presented evidence that proved that the appellant was not present at the scene on the night of the murder.

The appellant further argues that even assuming the jury reasonably could have concluded from the evidence that he was present at the time of the shooting, there was "a dearth of evidence that he engaged in any criminal behavior." According to the appellant, the evidence adduced at trial merely showed that he was an innocent bystander, not that he was a participant in the commission of the crimes. Related to this argument, the appellant asserts that there was no evidence that he knew Clark would be present that night, and "[t]hus, there simply [was] no evidence of a premeditated intent to kill him."

The State responds that there was sufficient evidence to establish the appellant's presence at the scene on the night of the shooting; that the appellant's claim that Clark's identification was not reliable is misplaced, as determinations as to the weight of the evidence and credibility of witnesses are properly left to the trier of fact; that the argument is without merit in any event as the evidence established that Clark's identification was reliable; and that there was sufficient evidence from which a rational trier of fact could find that the appellant participated in the commission of each of the crimes for which he was ultimately convicted.

■■■ The standard by which an appellate court reviews a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). *Accord McMillian v. State,* 325 Md. 272, 289–90, 600 A.2d 430 (1992); *Webber v. State,* 320

Md. 238, 247–48, 577 A.2d 58 (1990); *Thomas v. State,* 143 Md.App. 97, 121, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002). In considering the evidence in the record, the question is not "whether the evidence *should have* or *probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Fraidin v. State,* 85 Md.App. 231, 241, 583 A.2d 1065 (1991) (emphasis in original). *See also Thomas v. State, supra,* 143 Md.App. at 121, 792 A.2d 368.

In addition, in performing our review of the evidence, we must be "mindful of the respective roles of the court and the jury; it is the jury's task, not the court's, to measure the weight of evidence and to judge the credibility of witnesses." *Dawson v. State,* 329 Md. 275, 281, 619 A.2d 111 (1993). *See McMillian v. State, supra,* 325 Md. at 290, 600 A.2d 430. Indeed, the finder of fact, the jury in the instant case, is vested with the authority to "accept that evidence which it believe[s] and reject that which it d[oes] not." *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,* 308 Md. 208, 517 A.2d 1105 (1986).

The record discloses sufficient evidence to support the appellant's convictions. With respect to appellant's contention that there was insufficient evidence for the jury to find he was present at the scene on the night in question, it is well established that the testimony of a single eyewitness is sufficient. *See Branch v. State,* 305 Md. 177, 183, 502 A.2d 496 (1986); *Braxton v. State,* 123 Md.App. 599, 671, 720 A.2d 27 (1998). Clark positively identified the appellant in court and in a lineup as the second individual present at the shooting. Clark provided the police with a description of the suspect immediately following the shooting. The description was consistent with the appellant's physical features. Without more, Clark's testimony was sufficient to permit a reasonable factfinder to find that the appellant was present on the night of the shooting. The appellant's argument that Clark's identification testimony and evidence were unreliable goes to weight

and credibility, which, as stated above, were for the jury, not this Court, to decide.

With respect to whether the evidence was sufficient to establish beyond a reasonable doubt the appellant's criminal agency, we will consider each of the crimes in turn. As noted above, the appellant was convicted as an aider and abettor to Barnett on charges of second degree murder and unlawful use of a handgun. The trial court instructed the jury that to convict the appellant of aiding and abetting, it had to find that the State had proved that the appellant had furthered the commission of the crimes "by knowingly associating with the criminal venture with the intent to help commit the crime, by being present when the crime [was] committed and by seeking some act to make the crime succeed." It further instructed the jury that to return with a guilty verdict on those two counts, it had to find that the appellant "was present when the crime was committed and that [he] willfully participated with the intent to make the crime succeed." "[P]resence need not always be an actual immediate standing by, within sight or hearing of the fact; but there may be also a constructive presence, as when one commits a robbery or murder and another keeps watch or guard at some convenient distance." *State v. Williamson*, 282 Md. 100, 103, 382 A.2d 588 (1978) (emphasis in original).

There was ample evidence introduced at trial from which a reasonable fact finder could conclude that the appellant aided and abetted Barnett in the commission of the crimes against Dorsey, and that he committed attempted first degree murder and first degree assault against Clark as a principal in the first degree.

Clark testified that on the night of the shooting, he and Dorsey were walking up Douglas Street "turning on to Spring" when he saw the appellant and Barnett "[c]oming off of Lynmore," farther up Spring Street. He explained that "when we kept walking, ... they kept walking towards us. They crossed over in the middle of the street, and [Barnett] said [to Dorsey], 'Just the nigger I'm looking for,' " to which

Dorsey responded, "I still got that for you," with "a smile on his face." No more words were exchanged.

According to Clark, Barnett and the appellant "walked past [Clark and Dorsey].... [Barnett] stopped behind [Clark and Dorsey] like right here by the fence." The appellant "stopped right here about the car—there was a car parked right here. He was standing there and kept holding his head down and wouldn't look at us in the eye, ..." Clark stated that he knew Barnett had stopped behind him because "I [was] looking behind me, too." Clark went on to say that he and Dorsey "were both looking behind us, and [Clark saw Barnett] start[ ] to reach [into his waistband]." As Barnett started shooting, Clark and Dorsey "started to run."

Bullet fragments and spent shell casings were found at the scene. Ballistics evidence showed that seven of the casings came from a .32 millimeter handgun later recovered from Barnett's residence. Three bullet fragments from the same .32 millimeter gun were recovered from Dorsey's body and clothing.

Seven additional shell casings from a nine millimeter handgun also were found at the scene: three in the vicinity of Dorsey's body and four in the area to which Clark fled when the shooting started. The nine millimeter handgun later was recovered from the trunk of a vehicle belonging to Oskalia Barnes, the boyfriend of the appellant's sister. Barnes testified that sometime in June of 2000, the appellant had given him the nine millimeter handgun to hold, stating that "Black" {Barnett} was in trouble.

It is well established that "proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts." *Eiland v. State,* 92 Md.App. 56, 67, 607 A.2d 42 (1992), *rev'd on other grounds sub nom., Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993). Although there was no direct evidence that the appellant fired either of the weapons recovered in connection with these crimes, there was ample circumstantial evidence to permit the rational inference that the appellant was a willing participant

who acted with the intent to make the crimes succeed and the further rational inference that he participated as a shooter.

Logically, it is unlikely that Barnett fired two guns simultaneously at the fleeing victims. Clark testified that he and Dorsey ran in separate directions when the shooting started. The ballistics evidence showed that shots from the two handguns were fired in opposing directions. Thus, there was evidence from which reasonable jurors could find that the appellant participated as a principal.

Likewise, the evidence was sufficient for a reasonable factfinder to conclude that the appellant committed the crimes of attempted first degree murder and first degree assault against Clark. As stated above, the trial court instructed the jury that in order to find the appellant guilty of first degree assault, it had to find that the State had proven that the appellant intended and "actually tried to cause immediate [nonconsensual] physical harm to Michael Clark," and that he had used a firearm to commit the assault. *See* article 27, section 12A–1. Even in the absence of direct eyewitness evidence that the appellant fired the nine millimeter gun, the circumstantial evidence adduced supported the State's theory that the appellant shot at Clark with the nine millimeter gun as he was retreating by showing both the intent and the actual attempt to cause Clark immediate physical harm.

The evidence also was sufficient to support the appellant's conviction for attempted first degree murder of Clark. The trial court properly instructed the jury that first degree murder is the intentional killing of another person with willful deliberation and premeditation. The court went on to instruct that to find that the appellant *attempted* to commit first degree murder, the jury would have to find that he made "a substantial step beyond the preparation for the commission of murder in the first degree."

Contrary to the appellant's argument, the evidence did not establish that he lacked sufficient time to form the requisite premeditation to kill Clark. Premeditation does not require a specific lapse of time between the thought and

the action. The State need only show that there was "time enough to deliberate." *Tichnell v. State*, 287 Md. 695, 717, 415 A.2d 830 (1980). In other words, premeditation can be inferred "[i]f the killing results from a choice made as the result of thought, however short the struggle between the intention and the act." *Id.* at 718, 415 A.2d 830. In *Tichnell*, evidence that the defendant fired multiple shots was sufficient to establish premeditation and deliberation on his part. *Id.* at 719, 415 A.2d 830. *See also Hunt v. State*, 345 Md. 122, 161, 691 A.2d 1255 (1997) ("the delay between firing a first and second shot is enough time for reflection and decision to justify a finding of premeditation and deliberation."); *Robeson v. State*, 39 Md.App. 365, 381, 386 A.2d 795 (1978) ("[T]he firing of two shots separated by an interval of time, . . . has been held to be sufficient evidence of deliberation and premeditation"), *aff'd on other grounds*, 285 Md. 498, 403 A.2d 1221 (1979).

Here, the ballistics evidence showed that four shots from the nine millimeter handgun were fired in the direction in which Clark fled. Thus, a reasonable fact finder could have concluded that there was "time enough" for the appellant to premeditate and deliberate before firing the weapon multiple times. In addition, the presence of the four spent casings provided sufficient evidence that the appellant took a "substantial step beyond preparation toward the commission of murder in the first degree."

**SENTENCE VACATED AS TO FIRST DEGREE ASSAULT CONVICTION. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**